# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NAPOLEON HARRIS, | * |
| Plaintiff | * |
| v. | * CIVIL NO. JKB-18-3562 |
| MARK T. ESPER, Secretary, U.S. Department of the Army | * |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Napoleon Harris sued his former employer, Mark T. Esper, Secretary of the U.S. Department of the Army ("Army"), alleging multiple violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*. Specifically, Harris brings claims for discrimination, hostile work environment, and unlawful retaliation. The Army moved to dismiss, or, alternatively, for summary judgment, and the matter is fully briefed. No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, the Army's motion to dismiss will be granted with respect to Harris's claims of discrimination and hostile work environment and denied with respect to Harris's claim of retaliation.

## I. *Factual and Procedural Background*[1]

Plaintiff, an African-American male, was hired by the Army as a civilian Intelligence Specialist at Fort Meade, Maryland in March 2012. (Compl. ¶¶ 6–7, ECF No. 1.) Once individuals are hired by the Army, the Army works with the National Security Agency ("NSA") to evaluate

---

[1] As explained below, *infra* Part II, the Court will treat the Army's motion as a motion to dismiss. Accordingly, the facts in this section are taken from the Complaint and construed in the light most favorable to Plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

1

new employees and place them into appropriate roles at the NSA. (*Id.* ¶ 13.) Over the next few months, Harris took a variety of training courses and interviewed with different companies within the NSA for placement in a permanent position. (*Id.* ¶¶ 13–19.)

Starting in June, Harris also began discussing the possibility of transferring to Fort Gordon, Georgia. (*Id.* ¶¶ 34–47.) Several Army employees tried to help Harris in this process by telling him they would look into positions for him, forward along his resume, and try to find him a placement. (*Id.* ¶¶ 35, 37, 39, 41.) One supervisor, Lieutenant Trotter, told Harris there were no positions available for him at Fort Gordon after she "allegedly looked into transferring" Harris. (*Id.* ¶ 39.) Another employee told Harris that it would be three to five years before a position at his level would be available at Fort Gordon. (*Id.* ¶ 38.) Harris alleges these statements were false, and that there were Intelligence Specialist openings at Fort Gordon during this time. (*Id.* ¶ 40.) In December 2012, Harris asked another employee, Colonel Buckner, for a transfer, but she told him that she did not have authority to approve such a transfer—a statement Harris challenges because she sought to recruit military employees to transfer to Fort Gordon during this time. (*Id.* ¶¶ 45–46.)

Throughout this time, Harris still did not have a permanent employment placement. In fall of 2012, Captain Rhoades, a white male, became Harris's supervisor. (*Id.* ¶ 12.) Captain Rhoades told Harris that he needed to take the Remote Operations Control ("ROC") test, which covered different operating systems than Harris was used to working with. (*Id.* ¶¶ 28–29.) Harris alleges that Captain Rhoades told him the test score "did not matter" and would simply be used to help determine his career path and whether he needed any additional training. (*Id.* ¶ 30.) Harris took the test around November 16, 2012, and Captain Rhoades told Harris he failed the test about a

week later. (*Id.* ¶ 31.) Captain Rhoades subsequently denied Harris's requests to review his test results. (*Id.* ¶ 32.)

On November 28, Harris received an employment evaluation which rated his performance as "Successful" from March 12, 2012 to September 30, 2012. (*Id.* ¶ 55.) The evaluation stated that Harris's objectives going forward would be to attend two training courses, which Harris had already completed. (*Id.* ¶ 56.)

On December 19, Lieutenant Trotter met with Harris to tell him that Captain Rhoades said Harris had "failed to meet the minimum qualification standards associated with the interactive on-net operator work role," and that Harris needed to resign or he would be terminated. (*Id.* ¶¶ 48–51.) Captain Rhoades's grounds for this recommended termination were that Harris was "argumentative," "not interested in learning and/or doing new things," and had knowledge gaps which had required additional training.[2] (*Id.* ¶ 53.) Lieutenant Trotter also said that Harris was being terminated because he had rejected a job placement offer at an NSA work center—a fact Harris denies. (*Id.* ¶¶ 57–58.)

Following Harris's meeting with Lieutenant Trotter, Harris emailed Colonel Buckner, Lieutenant Trotter, and Captain Rhoades to report a complaint about discrimination and request contact information so he could file a formal complaint with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 62.) Harris alleges multiple individuals testified that his brigade was "plagued by issues of discrimination." (*Id.* ¶ 59.) He says that African-Americans complained about receiving less favorable treatment, being "terminated or released at higher rates," and being "unfairly described as 'unskilled' or 'untrained.'" (*Id.*) The week of December 20, Harris met with Colonel Buckner and others to "detail[] the disparate treatment he experienced after being

---

[2] Though Harris seems to suggest that failing the ROC test was one of the grounds of his proposed termination, Harris never alleges that anyone told him he was being terminated because he failed the ROC test.

3

hired and the denial of his repeated requests to be transferred to Georgia." (*Id.* ¶ 63.) Colonel Buckner told Harris that the Intelligence Specialist position was not available anymore, but she placed him in a permanent position in the same brigade as a network administrator. (*Id.* ¶ 64.) Harris was then detailed to this role for a 90-day evaluation period. (*Id.* ¶ 72.)

In January 2013, Harris and another employee met with someone to discuss racial discrimination.[3] (*Id.* ¶ 61.) Harris believed he had been treated differently because of his race and worse "than his skill set deserved." (*Id.* ¶ 61.) A few months later, in April 2013, Corey McGriff, a contractor, emailed Harris with links to a federal employment attorney and the Inspector General's website "based on his observations that the Army was discriminating against" Harris. (*Id.* ¶ 87.)

On April 12, 2013, Mr. Young, a white male who served as Harris's new supervisor, stated in Harris's 90-day assessment that Harris had failed to satisfactorily complete his three assignments. (*Id.* ¶ 89.) By June 2013, Young said Harris was "performing adequately from a technical point of view." (*Id.* ¶ 90.) Young said that he did not discuss the assignments identified as unsatisfactory from the April review. (*Id.* ¶ 91.) Though he later said Harris "lack[ed] initiative and leadership," this was not brought up with Harris at this time. (*Id.* ¶ 92.)

After a few months as a network administrator, Harris began having conflicts with Young regarding his attendance. (*Id.* ¶¶ 77–83.) In May 2013, Young agreed that Harris could have a flexible work schedule that would allow him to work an extra hour each day for nine days in return for having the tenth day off, resulting in long weekends every other week. (*Id.* ¶ 78.) Despite the fact that Harris said he always sought prior permission for late arrivals or absences, a dispute arose among Young and Harris regarding leave taken over the July 4th holiday. (*Id.* ¶ 77.)

---

[3] Harris does not identify what role, if any, this individual had in the Army. Nor does he allege that anyone else at the Army, except for his co-worker who accompanied him, knew about this complaint.

4

On July 3, 2013, Harris "emailed Mr. Young as a courtesy reminder" that he would be getting in around 10:00–11:00 a.m. on Tuesday, July 9 after traveling from Atlanta. (*Id.* ¶ 79.) On July 5, Young responded via email that he could not approve this leave because Harris could have returned earlier and not missed an additional day of work. (*Id.* ¶ 80.) Harris says he did not see this email until July 9, when his train back was running over three hours late. (*Id.* ¶ 81.) When Harris returned to work, Young told him to code his leave as "AWOL," or absent without leave. (*Id.* ¶ 82.) Harris alleges Young had previously approved Harris's leave request and that Young revoked Harris's approved leave on July 5—when Young knew Harris was already out of the office—because Young wanted a reason to fire Harris.[4] (*Id.* ¶ 83.)

On July 15, 2013 Harris told Young and another employee that he had "reported the time card issue to both CPO and the EEO office."[5] (*Id.* ¶ 84.) Harris also told Major Ross, his second-line supervisor, "that he had reported Mr. Young's harassment and discrimination to EEO[C]" and Major Ross was "very hostile towards him" in response. (*Id.* ¶ 85.) Harris states that at this point "his conditions of employment had changed, resources were withdrawn," and Major Ross began addressing him more formally as Mr. Harris, as opposed to using his first name as she previously did. (*Id.* ¶ 86.)

On July 23, 2013, Young asked Harris to open and close the Deer Park facility, which was under construction to become a Sensitive Compartmented Information Facility ("SCIF"), and to escort workers and technicians at the site. (*Id.* ¶ 98.) Because it was under construction, Harris says that it was not an official SCIF yet. (*Id.* ¶ 99.) The Army's Site Security Officer ("SSO") for Deer Park asked Harris and several other employees to keep their cell phones with them since there

---

[4] The fact that Harris was able to check his email while his train was running late suggests that he did indeed have access to email from July 5 through July 9.

[5] Harris does not provide a definition for the term "CPO."

5

was no other way to contact individuals at the facility while work was being completed. (*Id.* ¶ 105.) Harris alleges that the SSO gave the technicians and vendors Harris's cell phone number so they could reach him because no telephone lines were set up yet at the site. (*Id.* ¶¶ 103–104.) Harris received a call on his cell phone from an Army network technician who knew he was at the Deer Park facility, and the other Army employees who were present at the site also used their phones during this time. (*Id.* ¶¶ 106–08.)

The following week, McGriff emailed Harris "Code Red," and stated that Major Ross had contacted him "repeatedly" regarding Harris's EEO complaint. (*Id.* ¶ 118.) That same week, Harris was assigned an EEO counselor who interviewed Young and Platt, another management official, and told them about Harris's allegations. (*Id.* ¶ 114.) On August 6, Harris learned that the Army wanted to mediate his complaint. (*Id.* ¶ 115.)

Before this could happen, on August, 7, 2013, Harris was officially terminated. (*Id.* ¶ 93.) The Army stated Harris was terminated because (1) he was late seven times between April and July; (2) he violated security regulations by bringing his cell phone to the Deer Park SCIF facility and leaving technicians and vendors unattended; and (3) he "fail[ed] to demonstrate any initiative and . . . required close supervision." (*Id.* ¶ 93.) It is unclear who drafted this termination letter. Major Ross stated that Young wrote it and she signed it, but Young says he never saw the termination letter. Regardless, Harris asserts that the Army's stated reasons for his termination are false. (*Id.* ¶ 96, 108–12.) Harris claims that for every date the Army says he was late, he either had approved leave or completed a full nine hours of work. (*Id.* ¶ 96.) He also argues that the Deer Park facility was not a SCIF, that he was told by the SSO to bring his cell phone to the site, and that other employees were not punished for bringing their phones to Deer Park. He also argues

6

that his performance throughout this time was satisfactory and that "no one" saw Harris as uncooperative or lacking initiative. (*Id.* ¶¶ 74, 111–12.)

## *II. Nature of the Motions*

The Army has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for summary judgment pursuant to Rule 56. (Mot. to Dismiss, ECF No. 15.) In response, Harris filed a declaration opposing summary judgment and arguing he requires additional discovery to oppose the Army's motion. (Harris Decl. ¶¶ 4, 14–15, ECF No. 18-1.) The Court will first determine which standard will be used to judge this motion.

Pursuant to Rule 12(d), a motion to dismiss must be converted into one for summary judgment if the moving party presents evidence outside the pleadings which the court considers. Courts have "'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" *Sager v. Hous. Comm'n of Anne Arundel Cty.*, 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1366 (3d ed. 2004, 2011 Supp.)). However, the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12. Accordingly, the court may deny or defer consideration of a summary judgment motion "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "Such a request is 'broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th

7

Cir. 2010)). However, the court may deny a request for discovery "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995).

Harris has submitted a declaration pursuant to Rule 56 in which he argues against treating the Army's motion as one for summary judgment and asserts that additional discovery is needed which is essential to his opposition. (Harris Decl.) Though not every piece of discovery Harris requests would create a genuine dispute of material fact, Harris has properly identified several pieces of evidence which convince the Court that summary judgment is premature. At the summary judgment stage, Harris would have the burden of demonstrating that the Army's proffered grounds for termination were false. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Harris has successfully identified several pieces of evidence which would raise a genuine issue of fact as to the real reason he was terminated in August 2013. First, Harris lists several contractors whose testimony he believes will support his case. One such individual is Corry McGriff, who emailed Harris the phrase "Code Red" the day before Plaintiff was terminated because Major Ross had contacted McGriff "repeatedly" regarding Harris's EEO Complaint. (Compl. ¶ 118.) Another individual whose testimony Harris requests is Lorenzo Artis, who "testified the Deer Path facility was not a SCIF during July 2013." (Compl. ¶ 101). Harris also states that Mr. Artis was instructed to keep his cell phone with him at the Deer Park facility during July 24–26, 2013, did so, and yet was not terminated for this behavior. (*Id.* ¶¶ 105, 108–09.) Harris also requests discovery regarding the Army's security policies and protocols. (Harris Decl. ¶¶ 11–12.) All three of these pieces of evidence could raise a genuine issue of material fact about whether the Army's purported reasons for Harris's termination—including his violation of security

standards at the Deer Park facility—were false, and whether he was instead fired as unlawful retaliation for protected activity. Accordingly, the Court will treat the Army's motion as a motion to dismiss.

### *III. Standard*

The Army filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Mot. Dismiss at 1.) A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of the mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. Courts must "accept the well-pled allegations of the complaint as true, . . . constru[ing] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra*, 120 F.3d at 474. "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts need not accept legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

Plaintiffs need not "plead facts that constitute a prima facie case in order to survive a motion to dismiss." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012). However, the plaintiff must present facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### *IV. Analysis*

Title VII protects employees against racial discrimination in the workplace, 42 U.S.C.A. § 2000e-2, and retaliation for making charges alleging such discrimination, 42 U.S.C.A. § 2000e-3. Harris has alleged that he was discriminated against based on his race and that he was retaliated against for making claims challenging the Army's discriminatory practices. The Court will address each count in turn.

### A. *Discrimination*

A claim of discrimination under Title VII lacking direct evidence requires plaintiff demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190. To survive a motion to dismiss, the plaintiff must allege facts that are not merely "consistent with discrimination," but rather must allege facts which "support a reasonable inference that the decisionmakers were motivated by bias." *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015) (emphasis omitted).

The presence of adverse employment action is "an absolute precondition" to an employment discrimination suit. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). *See also, Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) ("Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment."). Therefore, as a preliminary matter, the Court will determine which actions, if any, in Harris's Complaint constitute adverse employment action.

Adverse employment action under Title VII typically requires "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone*, 178 F.3d at 255. Harris argues that five separate acts constitute adverse

employment actions: (1) the Army's failure to place Harris in a permanent position after he was hired; (2) the Army's failure to transfer him to Georgia; (3) the threatened termination in December 2012; (4) coding Harris's absence on July 9 as "absent without leave"; and (5) Harris's termination in August 2013. (Opp'n Mem. at 15, ECF No. 18.) The Court will address each in turn.

### 1. *Lack of Permanent Placement*

Harris argues that the Army's failure to place him in a permanent employment position after he was hired constitutes an adverse employment action. But Harris fails to even suggest that this practice was out of the norm for new civilian hires, or that other similarly situated employees received permanent placements before he did. Harris explains in his complaint that the Army and NSA work together to evaluate new hires and determine their placement, and he says he spent the first few months in the Army taking training courses and interviewing with different companies for positions. (Compl. ¶¶ 13–19.) Harris even states that he told a supervisor that he "preferred" to take certain training classes prior to placement at a work center. (*Id.* ¶ 19.) Quite simply, nothing in Harris's complaint suggests this process was not business as usual for new civilian hires, and thus Harris cannot claim that the failure to place him in a permanent position was an adverse employment action.

### 2. *Failure to Transfer*

Harris also argues that the Army's failure to transfer him to Fort Gordon, Georgia, despite his repeated requests, constitutes adverse employment action. (Opp'n Mem. at 15.) But Harris was hired to work in Maryland—not Georgia—and he never alleges that he was promised such a transfer. Even if he had been promised such a transfer (a fact he does not allege), the Fourth Circuit has held that reassignments do not qualify as adverse employment action "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Boone*, 178 F.3d at

256–57. Harris does not allege that any of these things resulted from the Army's failure to transfer him to another state, nor does he allege that by continuing to work in Maryland he was facing a different employment situation than the one he signed up for. Therefore, the Army's failure to transfer Harris to Georgia is not an adverse employment action.

### 3. Threatened Termination

Harris alleges that he was also threatened with termination in December 2012. (Compl. ¶ 48.) However, soon after this threatened termination, Colonel Buckner placed Harris in a job with the same brigade as a network administrator. Harris makes no allegation that this was a demotion or that this job was in any way worse than the Intelligence Specialist job. Even if he found this job less desirable, "'[t]he mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action.'" *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). *See also, Boone*, 178 F.3d at 256 (holding "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect").

Nor can the Court say that the threatened termination itself rises to the level of an adverse employment action. While courts in this circuit have recognized threatened termination as adverse action in the context of retaliation claims, the standard for adverse employment action in discrimination claims is significantly more rigorous. *Compare Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (adverse action for retaliation claim only requires action that could "dissuade a reasonable worker from making or supporting a charge of discrimination"), *with Boone*, 178 F.3d at 255 (adverse action in discrimination claim usually requires "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion"). At least one court in this district has cast doubt on whether threats

to terminate employment would be satisfactory in the context of a discrimination claim. *Taylor v. Burwell*, Civ. No. PWG-13-1998, 2014 WL 3547337, at *9 (D. Md. July 16, 2014) (threatened termination combined with other acts "may not have been sufficiently adverse to support a discrimination claim"). Here, immediately following the recommended termination, Harris made a complaint about discrimination and Captain Rhoades subsequently placed Harris in a permanent position as a network administrator, a job he held until the following August. Because this threatened termination had no impact on Harris's overall employment status and was swiftly corrected, the Court cannot say that it rises to the level of an adverse employment action.

### 4. *Absent Without Leave*

Harris also argues that Young's decision to code his time on July 9 as absent without leave constitutes adverse employment action. However, Harris does not present facts which demonstrate this single occurrence had any impact on the "terms, conditions, or benefits" of his employment, as required for an action to qualify as an adverse employment action. *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997). When Harris was ultimately terminated, his absence without leave on July 9 was only one of many reasons the Army provided in support of his termination, which included six other dates where Harris was allegedly late or absent, Harris's alleged security violations at the Deer Park facility, and generally poor work performance. Accordingly, the Court does not find that one decision to mark Harris's absence on July 9 as absent without leave rises to the level of an adverse employment action.

### 5. *Termination*

Unlike the other actions Harris complains of, his termination in August 2013 undoubtedly qualifies as an adverse employment action. *Boone*, 178 F.3d at 256. However, though Harris has satisfactorily established the presence of adverse employment action through his termination, he

13

has failed to plausibly allege that his termination was in any way related to racial discrimination. Harris's 90-day assessment in April 2013 stated he had not completed his assignments satisfactorily. (Compl. ¶ 89.) Though Harris suggests he never saw this assessment, there is no requirement that plaintiffs be apprised of their employment performance prior to termination. Harris also disputes his supervisors' claims about his poor attendance and claims Young revoked his leave over the July 4 holiday because he was looking for a way to fire Harris. But Harris provides no facts which demonstrate these employment disputes about his attendance were based on Harris's race. A conclusory allegation of racial discrimination coupled with employment disputes does not create a plausible claim under Title VII. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("[A] difference of opinion, coupled with [plaintiff's] conclusory allegations of racism, cannot reasonably support the conclusion that [plaintiff's] discharge was motivated by racial animus."). In other words, while Harris has presented facts which could be consistent with discrimination, he has not presented any facts which support the reasonable inference that his supervisors were discriminatory in their decisions toward him based on his race.

Though Harris need not plead all the elements of a prima facie case to survive the motion to dismiss stage, he must plead facts which make his claim of racial discrimination plausible. Because Harris has failed to do so here, the Court will grant the Army's motion to dismiss Harris's claim of discrimination.

### B. *Hostile Work Environment*

A Title VII claim of a racially hostile work environment requires a plaintiff show: "'(1) unwelcome conduct; (2) that is based on the plaintiff's . . . [race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto v. Fontainebleau*

*Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted). Accordingly, even one instance can create a hostile work environment if the incident is sufficiently egregious. *Id.* at 280–81. A hostile work environment claim requires that the plaintiff subjectively perceive the environment to be hostile and that the environment is objectively hostile as judged by a "reasonable person." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In determining whether a workplace is a hostile environment, courts must look to "all the circumstances," which could include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Courts should also consider the workplace environment's "effect on the employee's psychological well-being." *Id.*

Even though Harris may have believed his workplace was racially hostile, his claim fails because he provides no facts demonstrating that a reasonable person would find that his workplace was indeed hostile. Harris has presented several separate instances over the course of his roughly 18-month employment in which he believes he was being treated unfairly by his supervisors. But workplace interactions which are "disrespectful, frustrating, critical, and unpleasant" do not create a hostile work environment. *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (unpublished). Nor were the handful of actions Harris complained of—a threatened termination that was swiftly corrected, a dispute over time off—sufficiently pervasive, severe, or frequent to warrant a finding that the work environment was objectively hostile. *See e.g.*, *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (unpublished) ("playing favorites with employees," "pitting employees against each other," and "unfairly

scrutinizing and criticizing [plaintiff's] use of leave and compliance" failed to create hostile work environment).

Critically, Harris has not presented any facts which suggest any unwelcome conduct was based on his race. Harris cannot save his hostile work environment claim by making general, conclusory statements about a racially discriminatory environment. Harris states that "[n]umerous witnesses" stated his brigade was "plagued by issues of discrimination" and that African-Americans complained they were treated poorly. (*Id.* ¶ 59.) But Harris provides no facts about the substance of these complaints, nor does he provide any examples of unwelcome behavior. The fact that one co-worker emailed Harris a link to an attorney because the co-worker observed "that the Army was discriminating against" Harris does nothing to salvage this claim. (*Id.* ¶ 87.) Another co-worker's subjective belief that Harris was being discriminated against, without more, has no bearing on whether the workplace was an objectively hostile environment. Furthermore, the "focus" of a hostile work environment claim is on the plaintiff's "personal experience." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) (allegations regarding treatment of other employees and "general culture" of company insufficient for jury to find hostile work environment existed). Harris also fails to provide facts suggesting that Young's treatment of his attendance records had anything to do with his race. Such general assertions, devoid of factual support regarding Harris's own experience, do not meet the plausibility standard required to survive a motion to dismiss. Because Harris has failed to plead an objectively hostile work environment, the Army's motion to dismiss this claim will be granted.

### *C. Retaliation*

A retaliation claim pursuant to Title VII requires the plaintiff to demonstrate: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between

the protected activity and the employment action." *Coleman*, 626 F.3d at 190. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Around July 15, 2013, Harris informed Young, Major Ross, and another employee that he had made a report to the EEOC and CPO about "the time card issue" and Young's "harassment and discrimination." (Compl. ¶¶ 84–85.) Harris was subsequently terminated on August 7. (*Id.* ¶ 93.) Making a complaint about behavior that violates Title VII is protected activity, 42 U.S.C.A. § 2000e-3(a), and termination clearly constitutes an adverse employment action. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (Plaintiff's "filing of the EEO complaint was protected activity, and his termination indisputably constituted adverse employment action.").

The issue here is whether Harris has adequately pleaded that there was a causal connection between these two events. Proximity in time between the employer's discovery of protected activity and adverse employment action can be sufficient to plead causation so long as the time between the two occurrences is "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam). The Fourth Circuit has found that a discrepancy of roughly ten weeks between the filing of an EEO complaint and termination is sufficient to establish the inference of causation. *King*, 328 F.3d at 151 n.5. Here, a little over three weeks—at most—passed between when Harris alerted Young and Major Ross to his complaint and his termination, (Compl. ¶¶ 84, 93), and the time between these two events falls squarely within the standard utilized by the Fourth Circuit. Accordingly, the Court finds that Harris has sufficiently pleaded his retaliation claim and the Army's motion to dismiss this claim will be denied.

*V.   Conclusion*

17

For the foregoing reasons, an Order shall enter granting the Army's motion to dismiss Harris's racial discrimination and hostile work environment claims and denying the Army's motion to dismiss Harris's retaliation claim.

DATED this 23 day of October, 2019.

BY THE COURT:

_____
James K. Bredar
Chief Judge