IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NAPOLEON HARRIS,                           *

    Plaintiff,                              *

    v.                                      *            CIVIL NO. JKB-18-3562

CHRISTINE WORMUTH, Secretary, U.S.  *
Department of the Army,

    Defendant.                              *

*    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

On August 7, 2013, Plaintiff Napoleon Harris was terminated as a civilian employee of the

Army. He claims that this termination was retaliatory and predicated on his engagement in

protected activity. Presently pending before the Court is Defendant Christine Wormuth's[1] Motion

for Summary Judgment (ECF No. 70). The Motion is fully briefed, and no hearing is required.

*See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth in this Memorandum, a separate

Order shall issue denying Defendant's Motion for Summary Judgment.

### I.      *Factual Background*[2]

On March 12, 2012, Plaintiff was hired by the 781st Military Intelligence Battalion ("781st

MIB"), a subordinate unit of the 780th Military Intelligence Brigade ("780th MIB"), and assigned

to work at Fort Meade, Maryland. (*See* Report of Investigation ("ROI") at 82,[3] Mot. Summ. J. Ex.

---

[1] Secretary Wormuth is named in her official capacity and as Plaintiff's former employer. (*See* ECF No. 1 ¶ 2.)
[2] The factual background provided is largely drawn from facts that are undisputed (or indisputable) by the parties. To the extent it addresses disputed facts, those facts are presented in the light most favorable to Plaintiff as the non-movant. *See Pittman v. Nelms*, 87 F.3d 116, 119 (4th Cir. 1996) ("[W]ith any motion for summary judgment, [a court] must view the evidence in the light most favorable to the nonmovant.").
[3] All citations are to the page number of the relevant filing.

1, ECF No. 71-1.) He joined as an "Intelligence Specialist (Operations)," with the "expectation that he could perform the basic duties as an interactive on-net operator [('ION')]." (*Id.* at 361, 429.)   Pursuant to Army Defense Civilian Intelligence Personnel System ("DCIPS") policy, Plaintiff was initially hired into a two-year trial period during which time "an employee may be separated with no right of appeal outside of the Department of Defense . . . at any time if it is determined that the employee's conduct or performance is unsatisfactory." (ECF No. 71-2.)

### A. *Plaintiff's Training and the ROC Assessment*

Although Plaintiff was hired with the expectation that he would fill an ION role, Captain William Rhoades noted "ability gaps within [Plaintiff's] background that led [Rhoades] to believe [Plaintiff] would not be immediately suitable as an operator." (ROI at 361.) After battalion leadership adopted Captain Rhoades recommendation that Plaintiff receive additional training, Plaintiff was enrolled in a number of trainings, which he completed between April and October of 2012. (*Id.*) Plaintiff successfully completed these trainings, achieving a score of "3 – Successful" in the relevant assessment categories on a September 2012 Performance Evaluation. (*See id.* at 377–78.)

On November 16, 2012, Plaintiff took, but did not pass, the Remote Operations Center ("ROC") assessment, a proprietary exam administered by the NSA. (*See* Fact-Finding Conference Volume I ("FFC I") at 142–43, Mot. Summ. J. Ex. 2, ECF No. 70-4.) Lieutenant Colonel Dietra Trotter (*id.* at 130–31), testified that "when someone doesn't pass the ROC assessment, that means they are not going to be an ION, period. . . . That means I have to find another job or another work role that I can then redirect them toward." (*Id.* at 144; *see also* ROI at 361 (explaining the ROC assessment "is necessary to enter into the Interactive operator training pipeline").) Following Plaintiff's unsuccessful ROC assessment, Lieutenant Colonel Trotter attempted to place him at

Fort Gordon, Georgia and offered him a position in the "[781st MIB] S6[4] because we were woefully short." (FFC I at 144–45.) Plaintiff declined this position and was declined for a position at Fort Gordon. (*Id.* at 145.) Based on his failure to be placed in an alternative position, Plaintiff was scheduled for termination. (*Id.* at 145–46.) This recommendation was documented in a December 12, 2012 memorandum drafted by Captain Rhoades. (ROI at 361.) That memorandum did not mention the other opportunity (i.e., the S6 position) offered to Plaintiff, but rather explained that Plaintiff "failed the ROC assessment and did not qualify for interactive operations" and "recommend[ed] his immediate discharge due to his failure to meet qualifications for his work role." (*Id.*)

### B. *Plaintiff's Placement as an S6 in the 780th MIB*

When Plaintiff's termination was escalated to the Brigade Command Group, it came as a surprise to Senior Cyber Adviser Gregory Platt and Colonel Jennifer Buckner. (Fact-Finding Conference Volume II ("FFC II") at 13, Mot. Summ. J. Ex. 3, ECF No. 70-5.) Platt, who served as "the senior civilian to the Brigade[,]" (*id.* at 7), was particularly concerned because he "did not believe that . . . the unit did its best effort to prepare [Plaintiff] for the On Net Operation Assessment." (*Id.* at 14.) Rather, he believed "they put him into that ROC assessment unprepared . . . and then the unit used [his failing the assessment] as the basis for separation." (*Id.*) While acknowledging that "as a probationary employee[, it] was perfectly within their obligations [ ] to [terminate Plaintiff,]" Platt was of the view that the Army "recognize[d] a certain skill set with [Plaintiff], and we needed to try to put those skills to the right efforts." (*Id.*) Platt eventually "convinced [Colonel Buckner] to allow [Plaintiff] to say [sic] on in a different capacity up at the

---

[4] S6 refers to an Army staffing designation for persons "responsible for all communications [and] network infrastructure. Essentially . . . making sure that the unit can communicate in whatever means and whatever domain they need to." (*Id.* at 154.)

Brigade staff within our IT Department." (*Id.* at 14–15; *see also* FFC I at 47–48.) Plaintiff began his role as an S6 in the 780th MIB on January 3, 2013. (FFC I at 17.)

### C. Plaintiff's Work Attendance

During the time that Plaintiff was employed by the 780th MIB, he visited family in Georgia one or two times per month. (*See* Harris Decl. ¶ 8, Opp'n Mot. Summ. J. Ex. 10, ECF No. 74-11.) After a particularly turbulent flight in February 2013, Plaintiff began making the trip between Maryland and Georgia by train. (*Id.* ¶¶ 8–9.) Taking the train caused Plaintiff to arrive later than his expected start time on the Mondays after he visited family in Georgia. (*Id.* ¶ 10.) Plaintiff was initially permitted to work late on days he arrived late to make up hours. (*See id.* ¶ 10; *compare also* ROI at 79 (citing that Plaintiff "arrived to work late on . . . April 8, 15, 22, 29; May 14; and June 3, 17"), *with* ECF No. 70-8 at 9–14 (noting Plaintiff worked full days on April 8, 22, and 29).)[5] Plaintiff's supervisor, Michael Young, further accommodated Plaintiff by transitioning him to a flexible work schedule that permitted Plaintiff to take every other Friday off. (*See* FFC I at 226 ("[I]n the May timeframe, his tardiness was noticed, and we adjusted so that he would have a flexible schedule where he would work essentially nine days at nine hours and then have . . . the 10th day off.").

On June 17, 2013, Plaintiff again arrived late to work, having taken a train from Georgia that arrived at 9:53 a.m. on Monday morning. (*See* ROI at 556.) Rather than permit Plaintiff to work late and make up the time, Young instead required him to submit a request for two-and-a-quarter hours of leave without pay. (*See* ROI at 557; *see also* Harris Dep. at 45, Mot. Summ. J. Ex. 5, ECF No. 70-7.) Then, the week of July 4, 2013, Plaintiff spoke with Young about taking leave on July 9, 2013. (Harris Dep. at 46–47.) After Young verbally approved, Plaintiff followed

---

[5] The remaining days for which Plaintiff was cited as arriving late to work are marked as either Sick Leave (April 15, May 14), Annual Leave (June 3) or Leave Without Pay (June 17). (*See* ECF No. 70-8 at 9, 11, 13–14.).

up with an email confirming that he would be late on July 9. (*Id.* at 47.) Young ultimately responded to the that email rejecting Plaintiff's request for leave, though Plaintiff did not receive Young's response and followed through with his plan to arrive late on July 9. (*Id.*) When Plaintiff arrived late, Young required him to enter his time as Absent Without Leave. (*See* ROI at 364.) This designation was subsequently amended to permit Plaintiff to use annual leave for the time he had missed. (*Id.* at 365.)

Both Plaintiff and Young took further steps based on their disagreement regarding Plaintiff's delayed arrival on July 9, 2013. Young contacted Platt and requested that he review timekeeping procedures with all S6 staff. (*See* ROI at 253; *see also* FFC II at 19–20.) Plaintiff, who felt as though he was being singled out with regard to enforcement of leave policy (FFC II at 19), contacted an Equal Employment Opportunity ("EEO") counselor to discuss how Young was managing the leave process. (*See* ROI at 38.) At this meeting, Plaintiff explained that he believed he was being discriminated against based on his race and age when "Young [ ] directed [Plaintiff] to sign his time card with code KA (AWOL) or KC (Leave without pay), although he had annual leave available for use." (*Id.*) Plaintiff also cited other concerns related to his job placement that he believed also evidenced discrimination. (*Id.*) Plaintiff's discussion with the EEO counselor were memorialized in an EEO Counselor's Report (the " EEO Complaint"). (*See id.* at 37–42.)

In the same timeframe, Platt scheduled a meeting to discuss timekeeping procedures with the staff. (FFC II at 19–20.) Coincidentally, both the meeting to review timekeeping procedures and Plaintiff's exploration of his EEO options with respect to those procedures occurred on July 15, 2013, causing Plaintiff to miss the timekeeping meeting. (*See id.* at 20 ("[W]hen the meeting was called for, everyone was in attendance except for Mr. Harris, and [ ] at that point no one knew where he was at."); Harris Decl. ¶ 15 ("I informed Mr. Young and Mr. Platt that I had contacted

an EEO Counselor because my meeting with the EEO Counselor caused me to miss an impromptu meeting that Mr. Platt conducted.").) Because Plaintiff had missed the staff-wide meeting, Platt discussed timekeeping procedures with Plaintiff later the same day. (ROI at 253.)

### D. Discussions of Plaintiff's EEO Complaint

Both Young and Major Ross, Young's supervisor, were aware that Plaintiff had filed the EEO Complaint regarding Young's handling of Plaintiff's requests for leave. Plaintiff had told Young about the meeting with the EEO counselor when he explained why he had missed the timekeeping meeting held by Platt. (*See* Harris Decl. ¶ 15.) A week later, Plaintiff also advised Major Ross that he "went to the EEO because Michael Young tried to get [Plaintiff] to sign [his] timecard with a code of KC [indicating Absent Without Leave]." (FFC I at 13.)

Corry McGriff, a coworker of Plaintiff, testified that both Young and Major Ross discussed Plaintiff's EEO complaint "in front of . . . Army employees, contractors, and government employees." (McGriff Depo. at 43, Opp'n Mot. Summ. J. Ex. 8, ECF No. 74-9.) McGriff further testified that after Major Ross spoke publicly about the EEO Complaint, "the environment changed. Everybody was on eggshells and scared to talk, things like that." (*Id.* at 42.)

### E. The Deer Path Facility

On July 23, 2013, shortly after Plaintiff advised Major Ross of the EEO Complaint, Young assigned Plaintiff to open and close the Deer Path Facility between July 24 and July 26, 2013 and advised Plaintiff to "[g]et with the S2 for access control instructions." (*See* ROI at 456; *see also* Young Decl. ¶ 4, Mot. Summ. J. Ex. 11, ECF No. 70-13.) The Deer Path Facility was, at the time, being made "operational as the headquarters for the 781st MIB." (Perez Decl. ¶ 4, Mot. Summ. J. Ex. 12, ECF No. 70-14.) The Deer Path Facility was also intended to serve as a sensitive compartmented information facility ("SCIF") and, as such, was subject to several security

6

restrictions. (*See* Young Decl. ¶ 8; *see also* Harris Dep. at 24 ("I saw a SCIF sign posted somewhere, but the building was completely empty."). *But see* FFC II at 34 ("Deer Path. But at that time I don't think it was a SCIF at the time [Plaintiff] was working.").) These included that "cell phone use was not permitted in the facility beyond the guard desk near the main entrance"; that "access to the Deer Path facility was limited to those with authorization"; that "[t]hose without an appropriate clearance and authorized access were required to be escorted at the facility"; and that certain "equipment was not permitted to be left unattended for security reasons." (*Id.* ¶¶ 4–7.) Plaintiff avers that he was not formally briefed on these requirements during the time he was assigned to the Deer Path Facility. (Harris Dep. at 23.)

During the time that Plaintiff was assigned to the Deer Path Facility, he ostensibly violated these security restrictions in two ways. First, on July 25, 2013, he brought a personal cell phone into the Facility and received a phone call which he took beyond the main entrance. (Harris Dep. at 31.) Second, on one occasion, Plaintiff left the facility with a colleague to eat lunch. (Harris Dep. at 33–34; Perez Decl. ¶ 8.) When he returned, he was confronted by Lieutenant Colonel Jonathan Perez who explained to Plaintiff that he had violated security protocols by leaving the equipment unattended when he went to lunch. (Perez Decl. ¶ 9; Harris Dep. at 35.) Plaintiff disagreed that equipment security was within the scope of his responsibilities at the Deer Path Facility, and told Perez to escalate the matter to either Plaintiff's supervisor, Young, or Young's supervisor, Major Ross. (Harris Dep. at 35.) The matter was ultimately brought to the attention of both Young and Major Ross. (*Id.* at 35–36; Perez Decl. ¶ 10.)

### F. Plaintiff's Job Performance and Termination Letter

On August 2, 2013, Major Ross sent a memorandum to Colonel Buckner "request[ing] immediate termination for [Plaintiff]." (ROI at 85.) In that memorandum, Major Ross cited four

7

grounds supporting Plaintiff's termination: (1) Plaintiff's attendance issues; (2) Plaintiff's "fail[ure] to take on the majority of tasks without requiring some form of oversight[;]" (3) the incidents related to the Deer Path Facility; and (4) an incident on August 1, 2013 where Plaintiff declined to assist a coworker because Plaintiff was "off duty." (*Id.*) On August 7, 2013, Major Ross sent another memorandum, this time to Plaintiff, confirming that Plaintiff was being discharged. (*Id.* at 79.) Although this memorandum did not mention the August 1 incident, it reiterated the three other grounds as reasons for termination. (*Id.*) The parties dispute whether these memoranda accurately characterized Plaintiff's performance during his time as an S6 with the 780th MIB.

The record in this case includes a memorandum for the record prepared by Young on April 12, 2013 and titled "Evaluation of Napoleon Harris (90 day)." (*See* ROI at 273.) In that memorandum, Young notes that Plaintiff "has not satisfactorily accomplished" several milestone tasks as expected during the first 90 days of his employment as an S6; "has become complacent in reaching out to find new tasks and expand his role"; and "has not stepped up to take the leadership role as he is expected to with his grade." (*Id.*) It concluded that Young "would not recommend that [Plaintiff] continue in his role with the S6 staff section." (*Id.*)

However, Young testified that he did not provide this memorandum to Plaintiff, but rather that he discussed his general concerns with Plaintiff during a June 2013 counseling session. (FFC I at 228–29.) Young further testified that, at this session, he told Plaintiff that "from a technical point of view [ ] he was doing an adequate job, but [Young]] did at that point bring up the extensive

8

leave," which suggests that the concerns raised at that meeting were related to Plaintiff's attendance rather than the performance concerns cited in the April memorandum. (*Id.* at 226.)

The April memorandum is also contradicted by the testimony of others who worked with Plaintiff. Plaintiff's coworker and team lead, Bernard Porter, who also reported to Young, testified that he never "notice[d] that [Plaintiff] seemed to not want to perform any tasks or that he seems to be uncooperative." (FFC II at 51.) On the contrary, he stated that Plaintiff "knows what he's doing" and provided an anecdote relating how Plaintiff had resolved a network issue that had stumped other members on his team. (*Id.* at 55.) This testimony was echoed by others who had worked directly with Plaintiff. (*See* McGriff Depo. At 33 ("[Plaintiff] was the fixer, I'll call it. He was very smart. [Leadership] called on him—they called on him for a lot of things."); Artis Decl. ¶ 19 ("[Plaintiff] was very knowledgeable, competent, and professional and he taught me several things I did not know when I worked with him."), Opp'n Mot. Summ. J. Ex. 9, ECF No. 74-10); FFC II at 39 (Accie Stokes testifying that Plaintiff's "[w]ork attitude is very good. His abilities, he's very smart, very educated, and he's very thorough, very thorough IT network person").)

### G. Further Discussions of Plaintiff's EEO Complaint

McGriff further testified that, after Plaintiff's termination, Major Ross intensified her interest in his EEO complaint. (McGriff Depo. at 44 ("Then when [Plaintiff] was fired, that's when [Major Ross] really pressed it, to have a conversation with me.").) McGriff explained that, after Plaintiff was fired, Major Ross and others spoke with him about Plaintiff's time with the 780th MIB. (*Id.* At 271.) In those conversations, McGriff felt that those who spoke with him were "trying to get a story together about [Plaintiff] when they found out he went to EEOC." (*Id.* at 270, 272.) In particular, he recalled them seeking corroboration for certain aspects of Plaintiff's work, such as that he came in late, went to lunch late, and was often "missing all day." (*Id.* at

9

271.) McGriff disagreed with these assessments of Plaintiff's work and habits. (*Id.*) McGriff was terminated on August 30, 2013, and believes that his termination was as a result of his refusal to cooperate in these conversations. (*Id.*; *see also* ECF No. 74-12 (termination letter for Corry McGriff).) Specifically, though McGriff's termination letter noted that he was "removed from [his] work assignment with the 780th MI BDE due to [ ] poor work performance and problems with [ ] reliability[,]" he testified that nobody from the Army had previously complained about his performance prior to his termination. (McGriff Depo. at 47–48.) He further testified that he was advised that the reason for his termination was not his performance, but rather his unwillingness to discuss Plaintiff's termination with Major Ross. (*Id.* at 41.)

## II.    Procedural History

On August 23, 2013, Plaintiff filed another Complaint with the EEO Office (the "August 23 Complaint") alleging multiple grounds of discrimination and harassment, including that his termination on August 7, 2013 was in retaliation for his contacting the EEO Office. (*See* ROI at 25.) The portion of the August 23 Complaint alleging retaliatory termination was dismissed by the EEO Officer because it was "unrelated information and it raises a matter that was not brought to the attention of an EEO counselor and is not like or related to the matter addressed by the counselor." (*Id.* at 138.) Instead, with respect to his retaliation allegation, "[a]n EEO Collateral Duty Counselor [was] assigned to conduct an inquiry into [Plaintiff's] alleged allegations [sic] that the agency reprised against [him]" prior to further consideration by the EEO Office. (*Id.*) Plaintiff

filed an additional formal complaint on September 19, 2013, reiterating his claim that his termination was retaliatory. (*See id.* at 143.)

### A. Procedural History Before the EEOC

The August 23 Complaint, as supplemented by Plaintiff's September 19, 2013 filing, was investigated and presented to an Administrative Judge at the Equal Employment Opportunity Commission ("EEOC") who ultimately entered judgment in favor of the Army with respect to all of Plaintiff's claims of discrimination and retaliation. (*See* ECF No. 70-16 at 1, 19.) Plaintiff appealed this decision to the EEOC Office of Federal Operations, which affirmed the Administrative Judge's findings on August 16, 2018. (*See* ECF No. 70-18 at 8.) Plaintiff then requested reconsideration of the Office of Federal Operations' ruling on September 18, 2018. (ECF No. 70-19 at 19.) He then filed a Complaint in this Court on November 19, 2018. (*See* Compl., ECF No. 1.)

### B. Procedural History in this Court

Plaintiff's original Complaint asserted three claims: racial discrimination, a racially hostile work environment, and unlawful retaliation. (Compl. ¶¶ 124–34.) Defendant moved to dismiss, or in the alternative, for summary judgment. (*See* ECF No. 15.) The Court declined to convert this early Motion into one for summary judgment, but ruled that Plaintiff failed to state a claim with respect to his claims of racial discrimination and a hostile work environment. (*See* ECF No. 20 at 8–9, 18.) However, it concluded that the close temporal proximity between Plaintiff's report to the EEOC and his termination were sufficient to plead that his termination was retaliatory. (*Id.*

at 17.) At the close of discovery, Defendant moved for summary judgment with respect to this final surviving claim. (ECF No. 70.)

### III.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of [any] claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

### IV.    Analysis

As noted, the only claim remaining in this case is Plaintiff's claim that he was terminated in retaliation for exercising his right to file a complaint with the EEO. *See supra* Part II.B. The parties agree that, at summary judgment, this claim is governed by the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a Plaintiff must first establish a prima facie case by showing: "(i) that [he] engaged in protected activity, (ii) that [his] employer took adverse action against [him], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Foster*

*v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (internal quotation marks and citation omitted).  Once a plaintiff establishes this initial case, "[t]he burden then shifts to the [defendant] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.*  If defendant does so, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

### A. Prima Facie Case

Defendant initially argues that Plaintiff has failed to meet his threshold burden of a prima facie case. (Mot. Summ. J. Mem. Supp. at 18–23.)  Defendant's provision of non-discriminatory reasons for Plaintiff's termination renders the question of whether he has established a prima facie case irrelevant.  This is because "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *E.E.O.C. v. Mfrs. and Traders Trust Co.*, 429 F. Supp. 3d 89, 120–21 (D. Md. 2019) (internal quotation marks omitted) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008)).  Where, as here, Defendant advances a non-discriminatory reason for the adverse employment action, "the summary judgment inquiry focuses largely on the third step." *U.S. Equal Employment Opportunity Comm. v. CACI Secured Transformations, LLC*, Civ. No. JKB-19-2693, 2021 WL 1840807 (D. Md. May 7, 2021).  Accordingly, the Court will consider Defendant's arguments regarding whether Plaintiff has shown that "the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for [unlawful retaliation]." *Foster*, 787 F.3d at 250; *see also Mohammed v. Central Driving*

·*Mini Storage, Inc.*, 128 F. Supp. 3d 932, 946 (E.D. Va. 2015) ("In retaliation cases, the same type of evidence may be used to prove both the causal connection requirement and pretext.").

### B. Pretext

"A plaintiff can prove pretext by showing that the defendant's explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004); *see also Staley v. Gruenberg*, 575 F. App'x 153, 155–56 (4th Cir. 2014). This showing can take many evidentiary forms. For instance, a showing that defendant "at different times, gives different and arguably inconsistent explanations" may allow an "infer[ence] that the articulated reasons are pretextual." *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)). Likewise, "a factfinder could infer from the late appearance of [defendant's] justification that it is a post-hoc rationale, not a legitimate explanation for [its] decision." *Id.* (citing *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000)). Assuming Plaintiff proffers sufficient evidence such that a reasonable jury could find pretext, he need not offer independent evidence of retaliatory animus as "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). "Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.*

Applying these general principles to Defendant's proffered explanations for Plaintiff's termination leads the Court to conclude that various disputes of material fact preclude summary judgment. As discussed, Defendant argues that Plaintiff's termination was based on three

14

independently sufficient grounds: (1) his routine lateness; (2) security violations at the Deer Path Facility; and (3) his general failure to perform as expected. Plaintiff has adduced enough facts that, when viewed in the light most favorable to Plaintiff, could lead a reasonable factfinder to conclude that each of these three grounds was pretextual and that the but-for cause for Plaintiff's termination was his protected activity.

### 1.  Plaintiff's Attendance Issues

Defendant's first argument is that Plaintiff's repeated failures to arrive on time to work constitute non-retaliatory grounds for his termination. (*See* Mot. Summ. J. Mem. Supp. at 24–25.) The evidence establishes that Plaintiff's behavior plainly violated formal policy which provides that "civilians requesting leave or approved absences must complete a Request for Leave or Approved Absence and obtain written approval in advance of scheduled leave from a supervisor designated to make such approvals." (*See* ROI at 261.) Defendant further argues that the record indisputably establishes that Young had already begun escalating these issues prior to Plaintiff's protected activity by requiring Plaintiff to mark his missed time as Leave Without Pay and then Absent Without Leave. *See supra* Part II.C. Evidence in the record also suggests that Plaintiff's decision to take leave on July 9, 2013 "after his leave was denied was the last straw for the command." (*See* ROI at 41.) Based on this, Defendant argues that Plaintiff cannot show that his termination, though close in time to protected activity, was discriminatory because Plaintiff's "protected conduct . . . occurred amid corrective action by the Army." (Mot. Summ. J. Mem. Supp. at 23); *see also Staley*, 575 F. App'x at 156 ("[T]emporal proximity alone is not sufficient to establish that [ ] engagement in protected activity was a 'but for' cause.").

Despite the evidence marshaled in support of this grounds for termination, a reasonable factfinder could still conclude that Defendant's proffered reason was pretextual based on several

15

pieces of evidence. Initially, a reasonable factfinder could conclude that the formal leave policy was not strictly enforced prior to the July 15, 2013 meeting. Plaintiff testified that he had an oral agreement with Young and Major Ross that he would work late on the days that he arrived late. (Harris Decl. ¶ 10–11.) This agreement could be independently substantiated by the fact that Plaintiff's hours for several of the days he ostensibly arrived late are recorded as normal, nine-hour days. (*See* ECF No. 70-8.) Testimony from other sources suggested that other out-of-office time was also managed informally by "put[ting] on the board when [one] leaves, where [one is] going, and when [one is] coming back." (McGriff Dep. at 271.) Additionally, the July 15, 2013 timekeeping meeting occurred in spite of Plaintiff's absence, suggesting that the purposes was to broadly "reinforce [that all employees] had set schedules based on their Special Form 3056 E-Rs that is their work schedule that they were subject to review by management for their attendance, arrival and departures." (*See* FFC II at 20–21.) Platt also mentioned at that meeting that "the supervisor [ ] was responsible for ensuring that his workforce was meeting their obligations," suggesting both employees and supervisors had not scrupulously observed the leave policy. (*Id.* at 21.) From this evidence, a factfinder could infer that the July 15, 2013 meeting was not an escalation specific to Plaintiff, but rather a general retrenchment from an underenforced leave policy.

Further, Defendant has failed to explain why, even if these escalations were specific to Plaintiff, further escalation in the form of Plaintiff's termination was necessary after the July 15, 2013 meeting. Notably, there is some evidence in the record that Plaintiff attempted to correct his behavior and comply with management's new standards each time that he was penalized for his late attendance. After Plaintiff was required to take unpaid leave for his June 17, 2013 absence, Plaintiff flagged his next leave (July 9, 2013) for Young both verbally and, additionally, over

email. (*See* Harris Dep. at 47.) Then, after the July 15, 2013 meeting, it does not appear that Plaintiff had any additional absences until he was terminated on August 7, 2013. (*See* ECF No. 70-8 at 15–17.) Given that these corrective measures appeared to remedy Plaintiff's routine absences, a reasonable factfinder could conclude that Defendant had no reason to further escalate the matter by terminating Plaintiff. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 728 n.4 (4th Cir. 2019) ("[P]retext may be established by showing that a justification 'was insufficient to warrant the challenged conduct.'") (quoting *Wexler v. White's Fine Furniture, Inc.*, 713 F.3d 564, 576 (6th Cir. 2003)).

Last, the first *documentation* of a concern regarding Plaintiff's attendance occurred after his protected activity. (*See* ROI at 367 (memorandum dated July 31, 2013)); *see also Sears Roebuck*, 243 F.3d at 853 ("[A] factfinder could infer from the late appearance of [the] current justification that it is a post-hoc rationale."). Indeed, the documentation regarding the remedial actions taken by management was not created until March of *2014*. (*Id.* at 364–65.) Thus, this is not a case where a material dispute of fact regarding pretext can be rejected based on contemporaneous concerns about an employee's performance. *See Hannah P. v. Coats*, 916 F.3d 327, 343 (4th Cir. 2019) (finding no dispute of material fact where various contemporaneous memoranda cited prohibitive concerns about attendance). Rather, a reasonable factfinder could conclude that Young and Major Ross "creat[ed] a paper trail of 'trumped up' disciplinary charges" in order to justify Plaintiff's termination, and that such charges should be disregarded as a pretext. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

### 2. *The Deer Path Facility Incidents*

A reasonable factfinder could similarly reject Defendant's reliance on Plaintiff's security violations at the Deer Path Facility as grounds for his termination as a pretext. Plaintiff's

termination letter cites two security violations, the first of which relates to Plaintiff "bringing [his] personal cell phone into a Secure Compartmented Information Facility (SCIF) which is expressly prohibited." (ROI at 79.)  However, there is at least some evidence in the record that the Deer Path Facility was not a SCIF at the time Plaintiff worked there.  (*See* FFC II at 34.)  Further, the relevant Standard Operating Procedure ("SOP") provides that "[e]lectronic items are not authorized [in a SCIF] without SSO/SSR approval, items will only be allowed into unclassified areas" and there is additional evidence that "[t]he SSO requested that [Plaintiff and others] have [ ] cell phones because the building was empty . . . and cell phones were necessary to complete the work on the project." (ROI at 396.)  Another Deer Path contractor also testified that there was no guidance that "you could not have cell phones in certain areas of the facility[]" and that "several people [ ] had phones in the building." (FFC II at 34–35.)  From this evidence, a reasonable factfinder could conclude that—although Plaintiff used his cell phone at the Deer Path Facility— this was not a security violation that would ordinarily be grounds for termination.

Moreover, Plaintiff's termination letter primarily focuses on the second incident, described as Plaintiff leaving "individuals who did not have unescorted access privileges . . . unattended" in the SCIF. (ROI at 79.)  While the termination letter describes his carrying of his personal cell phone as "expressly prohibited," this second incident is emphasized as "completely unacceptable and represent[ing] a significant security breach." (*Id.*)  However, a reasonable factfinder could conclude from the discrepancies in the description of this alleged security violation that it was pretextual. *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d at 853 ("different and arguably inconsistent explanations" creates inference of pretext).

As noted, Plaintiff's termination letter indicates that his security violation was leaving individuals unattended in the SCIF. (ROI at 79.)  However, Lieutenant Colonel Perez's declaration

18

states that the security issue he raised with Young and Major Ross was that Plaintiff "had left the facility with the *equipment* unattended." (Perez Decl. ¶ 8 (emphasis added).) Similarly, Major Ross testified that her understanding was that Plaintiff had left "the place of duty for about two hours . . . when he was supposed to be guarding the SCIF area" rather than escorting persons or protecting equipment. (FFC I at 177–78.) Because it appears that there are inconsistent explanations and that these issues were not sufficiently investigated to clarify exactly what Plaintiff had done prior terminating him, a reasonable factfinder could infer that the Deer Path incidents were not the sort of security violations that would ordinarily justify termination.

Even a factfinder who concluded these incidents were sufficiently serious to justify termination could still conclude that they were pretextual on the grounds that Young and Major Ross set Plaintiff up to fail at the Deer Path Facility. *See Watson v. Norton*, 10 F. App'x 669, 679 (10th Cir. 2001) ("[C]ircuits have recognized that pretext can be proven by showing that a supervisor set an employee up to fail.") (collecting cases). Plaintiff's assignment to Deer Path occurred at the same time that Major Ross and Young became aware of and, based on McGriff's testimony, were publicly discussing Plaintiff's protected activity. (*See* McGriff Dep. at 43.) Additionally, Plaintiff points out that, if the Deer Path Facility was a SCIF, he was not adequately briefed on the relevant security protocols. The SCIF SOP requires, *inter alia*, that "[e]ach individual assigned to work inside a SCIF must read this SOP and *certify in writing annually* they understand and will comply with the established security processes, actions, and procedures." (ROI at 388.) There is no evidence that Plaintiff was provided this SOP, much less that he certified his understanding of its contents in writing. A reasonable factfinder could conclude that management's failure to adequately brief Plaintiff for his work at Deer Path—work they assigned

19

after he engaged in protected activity—was intended to create pretextual grounds for Plaintiff's termination. *Watson*, 10 F. App'x at 679.

### 3. *Plaintiff's Job Performance*

The final grounds cited for Plaintiff's termination is that he "failed to demonstrate any initiative and ha[s] required close supervision to accomplish [ ] assigned duties." (ROI at 79.) This grounds is facially disputed by the testimony of several of Plaintiff's coworkers who generally described him as a smart and effective colleague. *See supra* Part II.F. Moreover, like the other grounds on which Defendant relies, the documentation of this issue is spotty and inconsistent. Defendant primarily relies on an April 12, 2013 memorandum prepared by Young and titled "Evaluation of Napoleon Harris (90 day)" as establishing that concerns regarding Plaintiff's performance predated his protected activity. (*See* ROI at 273.) While this memorandum "would not recommend that [Plaintiff] continue in his role with the S6 staff section" based on Plaintiff's 90-day performance, it is not clear that this recommendation was acted upon. (*Id.*) Indeed, Young himself advised Plaintiff at "a midpoint counseling [that] from a technical point of view that he was doing an adequate job, but I had, but I did at that point bring up the extensive leave that he took and that he had been taking," suggesting Plaintiff's absences had become the focus of concern. (FFI at 226.) Notably, Plaintiff's documented leave issues did not begin until April, with Plaintiff having only one pertinent absence at the time the 90-day review memorandum was drafted. (*See* ROI at 79.)

Further, Major Ross's testimony suggests Plaintiff's termination was based on different attitudinal and performance concerns than those documented in Young's memorandum. She testified that it was "around the 90-day assessment when things started to change and we noticed a change in his behavior and work performance." (FFC I at 181.) These later-in-time concerns

20

are not documented prior to Plaintiff's termination and are contradicted by both Young's affirmance of the adequacy of Plaintiff's work during the midpoint counseling and the testimony of Plaintiff's coworkers. From these discrepancies and contradictory testimony, a reasonable factfinder could conclude that concerns regarding Plaintiff's work performance was a pretextual, post-hoc grounds for his termination. *Sears Roebuck*, 243 F.3d at 852–53 (fact that employer "offered different justifications at different times" and the "late appearance of [employer's] current justification" supported inference of pretext).

### 4. *Other Indicia of Retaliation as But-for Cause*

In addition to the evidence negating the legitimacy of Defendant's proffered justifications, there is also circumstantial evidence suggesting that Plaintiff's protected activity was a focus of Major Ross's in the time leading up to his termination. *See supra* Part II.G. Based on this, a reasonable factfinder that did not fully discount Defendant's explanations, could still conclude that "the protected activity was a but-for cause of [Plaintiff's] termination" even if was not "the sole cause." *See Guessous v. Fairview Prop. Invest., LLC*, 828 F.3d 208, 218 (4th Cir. 2016). For instance, a reasonable factfinder could conclude that Young and Major Ross had been willing to tolerate or attempt to correct issues with Plaintiff's work up until he filed a complaint with the EEO, even if those issues would have been perfectly valid reasons for terminating Plaintiff.

This is a close case at the summary judgment stage given Defendant's proffer of multiple, independently sufficient, non-discriminatory grounds for Plaintiff's termination. A factfinder who believed Defendant as to any one of these reasons could also readily conclude that Plaintiff's protected activity was not a but-for cause of his termination, that is, that "the unlawful retaliation 'would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) (quoting *Univ. of Tex. Sw. Med.*

21

*Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)); *see also Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 ("Title VII retaliation claims require proof that the *desire to retaliate* was the but-for cause of the challenged employment action."). In contrast, to conclude Plaintiff's termination was unlawfully retaliatory, a factfinder would be required to repeatedly credit Plaintiff's witnesses and draw favorable inferences from their testimony. However, each of those favorable determinations, both individually and collectively, can be made reasonably from the record before this Court. Put simply, "[t]o survive summary judgment [Plaintiff] need not squarely rebut his employer's explanation[s]. Instead, [he] must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motives for the firing." *Guessous*, 828 F.3d at 217–18 (quoting *King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting)). Plaintiff has cast such doubts here, and accordingly summary judgment in Defendant's favor must be denied.

### 5. *Conclusion*

For the reasons stated above, a separate Order shall issue denying Defendant's Motion for Summary Judgment (ECF No. 70).

DATED this __28__ day of March, 2022.

BY THE COURT:

James K. Bredar
Chief Judge