IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NAPOLEON HARRIS,<br><br>      Plaintiff,<br><br>   v.<br><br>U.S. DEPARTMENT OF THE ARMY,<br>CHRISTINE WORMUTH,<br><br>      Defendant. | Case No. 18-cv-3562-JKB |

**DEFENDANT'S MOTION FOR MISTRIAL AND FOR A NEW TRIAL**

Defendant, Christine Wormuth, Secretary of the United States Department of the Army, by and through undersigned counsel, moves for a mistrial and for a new trial due to serious procedural errors which undermine the reliability of this jury's deliberation. As explained more fully below, the Court should grant a mistrial and set in a new trial.

**INTRODUCTION**

This is a retaliation case brought pursuant to Title VII of the Civil Rights Act of 1964. The evidentiary portion of the trial on liability consumed 6 trial days in which the parties presented testimony from many witnesses as well as documentary evidence. The parties made their closing arguments on trial day 6, after which the Court instructed the jury regarding their role in the case, the legal framework that they were to apply, and their task as jurors to answer the question of whether Plaintiff Napoleon Harris' removal from civilian employment with the Army in 2013 was triggered or caused by his complaint of discrimination to the Army's Equal Employment Opportunity office about three weeks earlier.

1

In its instructions to the jury, the Court described that during its deliberations, the jury must remain together in the jury room, the importance of deliberating together as one jury to reach a verdict, and the Court explained that a court security officer ("CSO") would stand watch outside the jury room to ensure that the jury was kept together during its deliberations, and to prevent even the possibility or appearance of outside influence or tampering with their deliberations. The jury began their deliberations at approximately 3:40 p.m. on Tuesday, August 30, 2022. Thereafter, at approximately 5:30 p.m. the Court inquired via a note to the jury as to whether they wished to continue deliberating or return to the courthouse the next morning to continue deliberating. The jury responded via a note delivered to the courtroom deputy that they wished to be excused for the evening and to return the next morning. The Court excused the jurors and admonished them not to discuss the case with each other or anyone else that evening, not to consult any outside resources which might touch upon the case, and to return the following morning. The Court required the court security officers to confirm that all of the jurors had left the courthouse before counsel and the parties were excused from the courtroom.

The events which form the basis for the present motion, and which require a mistrial due to serious procedural flaws, occurred the following day, Wednesday August 31, trial day 7.

## BACKGROUND

### A. The jury's questions.

The jury reconvened at 9:30 a.m. for continued deliberations. (Harris Transcript Vol. 7, attached as <u>Defendant's Exhibit 1</u>, at 2). At approximately 10:05 a.m. the Court called counsel and the parties to the courtroom to respond to a communication from Juror No. 3 dated "8/31/2022, 9:39 a.m." requesting clarification involving several acronyms: "SSO, DIA, DAC, NSA CSS, [and] SAFE." *Id.* at 2. The jury also requested the transcript for the deposition of witness Corry

2

McGriff, who was permitted to testify, over objection, via deposition transcript due to his purported unavailability. The jury requested a calendar for the 2013 year. Finally, the jury requested to have the deposition designations of Plaintiff Napoleon Harris, which were read into the record relating to his admission to having used a cell phone inside the Deer Path SCIF, which was one of the Army's stated reasons for his removal. *Id.* at 2.

With input and agreement by the parties, the Court provided clarification regarding some of the acronyms and also provided a copy of a 2013 calendar. Counsel for the Army objected to providing copies of the deposition transcripts to the jury, and the jury was instructed to rely on their collective memory of the McGriff and Harris testimony together with all of the evidence received during the trial. (Defendant's Exhibit 1 at 10). In addition, counsel for the Army requested, and the Court included in the response, that any communication from the jury should be signed by Juror No. 1, the juror who was identified as the foreperson. *Id.* at 10. The courtroom deputy delivered the response to the jury.

At 11:58 a.m. the Court convened counsel and the parties again, to respond to another note from the jury. The message read: "Regarding the damages, can we increase the amount or is the 300,000K capped, or can we award in excess of the demand." (Defendant's Exhibit 1 at 13). The Court prepared a response, to which counsel agreed, explaining that if the jury finds the defendant liable, then it should award an amount of noneconomic damages that it finds the plaintiff has proven he incurred, and reiterating that plaintiff bears the burden of proving his damages and that the advice of counsel is not evidence. *Id.* at 13-14. The courtroom deputy delivered the response to the jury and reported that the jury had "received their lunch" as of 12:03 p.m.

3

**B. The lunchtime debacle.**

At 12:59 p.m. the Court called counsel and the parties to the courtroom again, with the Clerk of Court Catherine Stavlas present, the courtroom deputy clerk Mr. Gurevich, who had been assisting the Court throughout the trial, and also officials from the United States Marshal Service. (Defendant's Exhibit No. 1 at 15). At that time, counsel and the parties learned that the jury had provided an envelope to Mr. Gurevich, apparently containing the verdict, and that one of the jurors, Juror No. 6, had left the jury room undetected for some unknown period of time, before the jury had rendered their verdict. *Id.* at 16-17. The Court explained that the jury must be kept "together in some convenient place so that they might deliberate upon their verdict," and that did not occur. *Id.* at 17.

Mr. Gurevich, the courtroom deputy, explained that he had received a phone call from the CSO letting him know that "there was an issue." *Id.* at 18. Mr. Gurevich made his way to the courtroom and was informed by the CSO that he had witnessed Juror No. 6 "sneak back into" the jury room. *Id.*. As Mr. Gurevich was making his was to chambers to inform the Court that "a juror had snuck out," the door knocked and the foreperson handed the CSO the envelope and said out loud, "We have a verdict." Mr. Gurevich provided the envelope to the Court unopened, no one in chambers opened it, and the Court took custody of the envelope and taped it shut. *Id.* at 16.

**C. CSO Schreiber and CSO Eason.**

CSO James Schreiber was examined first by the Court. CSO Schreiber was on post in courtroom 5A. He testified that at 12:27 p.m., he relieved CSO Eric Eason, who was sitting "in the back in a chair with a clear view of the jury room door." *Id.* at 20. CSO Eason advised CSO Schreiber that the jury was at lunch. *Id.* at 20-21. Schreiber then explained that after he assumed his post in the courtroom in view of the vestibule area outside of the courtroom, a person that

4

Schreiber assumed was the jury foreperson knocked on the door to tell him "that one of the jurors had taken a brief break outside of the juror room to leave out into the hallway." *Id*. at 22. Schreiber testified that the juror referenced by the foreperson did not immediately appear before Schreiber called the courtroom deputy. *Id*. at 23. While Schreiber was calling the courtroom deputy, "there was a knock on the interior door that leads to the jury room." *Id*. The person that Schreiber then believed was the jury foreperson handed him an envelope. *Id*. Schreiber testified that the jury foreperson "tells me what it is and says that they're completed and that the gentleman that he had told had temporarily gone outside is already back." *Id*. CSO Schreiber did not personally witness the juror reappear but "immediately went in to identify who he was." *Id*. at 24. He identified that the juror who had taken a break was Juror No. 6, an African-American male, wearing a gray T-shirt, with hair just above his shoulder. *Id*. at 25.

When CSO Schreiber, "pulled" Juror No. 6 "out in the hallway" outside of the presence of the other jurors, and asked Juror No. 6 why he had left the jury room, Juror No. 6 gave no explanation. *Id*. at 26. When CSO Schreiber asked Juror No. 6 "if he realized the circumstances," Juror No. 6 "said that he went out and back, and that's all the explanation that I got from him." *Id*. CSO Eason, who was on duty to monitor the jury between 11:00 and 11:30 a.m., testified that while he was on duty, he noticed nothing unusual. *Id*. 28. He testified further that the alarm for jury room 5A, where the jurors were sequestered, was not activated because the CSOs could not find the key, a fact which was not to CSO Eason's knowledge imparted to the court personnel. *Id*. at 29. CSO Eason affirmed that if the alarm had been properly set, it would have sounded when either door to the jury room was opened. *Id*. at 30. CSO Eason further testified that if the jury wanted to communicate, a knock on the door would be made to alert the CSO who would then deactivate the alarm and receive the communication. *Id*. at 30-31.

5

**D. Questioning of the Jurors**.

Following the testimony of CSOs Schreiber and Eason, the Court conducted an inquiry of each of the jurors, starting first with the jury foreperson, Juror No. 1. After carefully instructing Juror No. 1 that nothing should be disclosed to the Court about the jury's deliberations, the Court then asked Juror No.1 whether, somewhere between 11:15 and 11:30 a.m., a juror left the jury room. *Id*. at 36. Juror No. 1 confirmed that Juror No. 6 left the jury room and was away therefrom for "approximately 10 to 15 minutes." *Id*. at 36-37. Juror No. 1 stated that he did not know "directly" where Juror No. 6 went but thought he may have gone to the "break room on the fourth floor" because "[s]ince the inception of the trial, that juror has been going to have lunch every day." *Id*. at 37. Maintaining that no other jurors had left, Juror No. 1 stated further that the jury was not engaged in deliberations when Juror No. 6 left. *Id*. Juror No. 1 said that a verdict had been reached before Juror No. 6 left the jury room and that the verdict form had been completed and signed by him before Juror No. 6 left the jury room. *Id*. at 38.

Juror No. 6 was then brought into the courtroom and questioned about his whereabouts upon leaving the jury room. Juror No. 6 stated that he "went down to get a sandwich from the little café on the first floor," consuming the sandwich while there. *Id*. at 43. He indicated further that he believed that he was absent from the jury room "about anywhere from 15 to 17 minutes." *Id*. at 44. He stated further that other than completing the transaction pertinent to the purchase of the sandwich, he did not communicate with anyone else while outside of the jury room and nor did he make telephone calls or encounter anyone on the way to the cafeteria. *Id*. at 44-45. Juror No. 6 stated further that the verdict of the jury had been recorded on the verdict form, *id*. at 46-47, but he could not be "100 percent sure." *Id*. at 48. Juror No. 6 did not witness Juror No. 1 sign the verdict form. *Id*.

6

The Court then next questioned Juror No. 2, advising her first not to reveal the jury's deliberations and then that she should not disclose the verdict. *Id*. at 55.  Juror No. 2 indicated that she saw the jury foreperson complete the verdict form and sign it. *Id*. at 56.  Juror No. 2 stated that Juror No. 6 left the jury room for 10 to 15 minutes and that the verdict form was signed upon his return. *Id.* at 57-61.  The Court then questioned Juror No. 3 who stated that Juror No. 6, after the courtroom deputy delivered to the jury sandwich bags, "went out the door and went downstairs to Mrs. T's to get a sandwich." *Id*. at 68.  Juror No. 3 stated the no discussions occurred while the other eight jurors remained in the room and that they had reached a verdict before Juror No. 6 left the jury room. *Id*. at 67-68.  Juror No. 3 sated further that Juror No. 6 "was gone for some time" and "we had assumed Juror No. 6 went to the bathroom . . . and it was discovered that he had gone downstairs for a sandwich." *Id*. at 68.  Juror No. 3 then added that the verdict form was not signed by the jury foreperson until Juror No. 6 had returned to the jury room and upon the juror's return there were no further deliberations because the jury had reached a verdict. *Id*. at 69-73.

Juror No. 4 was then questioned and stated that Juror No. 6 had left the jury room after the jury had reached a verdict and the verdict was recorded on the jury form, which recordation he witnessed. *Id*. at 76-78.  Juror No. 4 stated that Juror No. 6 was gone for "[m]aybe 30 minutes." *Id*. at 77.  Juror No. 5, upon questioning by the Court, confirmed that Juror No. 6 left the jury room when lunch was brought to the jury and that she was unsure how long he was gone. *Id*. at 81.  She stated that the verdict had been reached before his departure but the verdict form was only completed upon his return. *Id*. at 81-82.  She remembered that sequence because the jurors were then still awaiting the Court's response to the jury's question relating to damages and the jury waited until Juror No. 6 returned before reading the Court's response. *Id*. at 83.  Juror No. 5 stated that with Juror No. 6 then in the jury room, there was discussion about the Court's response to the

7

jury question and the verdict form was thereafter completed and signed by Juror No. 1. *Id*. at 83-86.

Juror No. 7 recalled that the verdict sheet had not been filled out and signed before Juror No. 6 left the jury room and was gone for "close to an hour." *Id*. at 88. Juror No. 7 stated that she believed Juror No. 6 went to get a sandwich "downstairs," and during that interim when there were just the eight jurors in the jury room, they discussed nothing about the case. *Id*. at 88. Juror No. 7 stated too when Juror No. 6 returned, the jury reconfirmed "what we all agreed before he left." Juror No. 8 stated that Juror No. 6 was gone for "[m]aybe 30 minutes" and that while Juror No. 6 was gone the jury did not continue to deliberate. *Id*. 93-94. Juror No. 8 explained that the verdict sheet was not filled out and signed until after Juror No. 6 returned to the jury room, and that the jury had discussion in "confirmation" of what the verdict was. *Id.* at 94. Juror No. 8 also recalled that the Court's response to the jury's question was received while Juror No. 6 was out of the jury room, and upon Juror No. 6's return they had substantive discussion of the Court's response. *Id.* at 95-96.

Juror No. 9 recalled that Juror No. 6 left the jury room, as far as he knew, to get a sandwich and was gone for the duration of their lunch, 30 to 40 minutes. Juror No. 9 explained that the foreperson, Juror No. 1, completed the verdict sheet and signed it after Juror No. 6 returned. Juror No. 9 stated that they had additional discussion in the way of "confirmation" after Juror No. 6 returned and before the verdict sheet was completed and signed. *Id.* at 100-101.

**E. The Court's instruction to stay together**.

After providing to the jury general instructions regarding their job in the case, and their role in weighing and judging the evidence, and specific instructions relating to the law of

8

retaliation, the Court explained that the CSO would serve as the bailiff in the case, "to keep you together in that room, [and] make sure nobody leaves," as follows:

> Court security officer functions as the bailiff, and he is right outside the door. His responsibility is to receive communications from you and deliver them to the court. Frankly, it's also his job to keep you together in that room, make sure nobody leaves, make sure that nobody from the outside tries to get in. Not that that has ever happened but we follow ancient traditions here and that's one of them. That's what the court security officer will do.

(Harris Jury Charge, attached as Defendant's Exhibit No. 2 at 24). The process of ensuring that the jury was indeed "kept together" was flawed, fatally so in this case, as evidenced by Juror No. 6 leaving the jury room undetected by the CSO and returning some time later, without being excused by the Court and before the jury had rendered its verdict. The Court acknowledged that the standard practice when the jury is deliberating is for the jury room to be alarmed, so that if one of the two doors to the jury room (into the courtroom or into the shared vestibule between courtroom 5A and 5B) is opened, the alarm will sound. Of course, that did not happen here because the alarm was never set. (<u>Defendant's Exhibit No. 1</u> at 28).

**F. The jury is all over the map and we cannot know what happened**.

The Court's careful questioning of the jury, and the fact of the violation, show that this jury is not credible as to what happened during its deliberations. The jurors' varying accounts of what had transpired only an hour or so before, is so varied as to compromise the entirety of this jury process. It is a mystery why Juror No. 6 left the jury room, according to him for lunch, when lunch was brought into the jury room by the courtroom deputy. Regarding the actual process of deliberation, Juror No. 1 (the foreperson), Juror No. 6 (who absconded from the jury room), and Juror No. 4 all say that the verdict sheet was completed and signed *before* Juror No. 6 ever departed the jury room. The others, Juror Nos. 2, 3, 5, 7, 8 and 9 state that the verdict sheet was not completed and signed until *after* Juror No. 6 had returned to the jury room. The jurors offer

different accounts about what Juror No. 6 was doing and for how long he was gone. The differing reports state that Juror No. 6 was in the bathroom, on the first floor of the courthouse at the café, or on the fourth floor of the courthouse where he had routinely taken his afternoon lunch break. The jurors also differ on the amount of time Juror No. 6 was missing, from being not clear on how long he was gone, from ten minutes to an hour. Juror No. 5 and Juror No. 8 recall receiving the Court's response to their question on damages while Juror No. 6 was away and discussing the response after his return. Some of the jurors say no discussion was held after Juror No. 6 returned to the courtroom while others, namely Juror Nos. 7 and 9 claim that there was discussion, "confirming" in nature (whatever that means) as to the verdict.

All of this demonstrates that the jury is not credible as to what happened during its deliberations with Juror No. 6, how long he was away, where he went, whether he had outside discussions or influences, and whether there were case discussions by the other jurors in his absence. By virtue of this violation and the jurors' collective lack of credibility because they are playing catch up, the whole process has been compromised and we cannot be sure that any verdict by this jury is the result of unanimous participation and deliberation, as required. We also cannot rule out any improper influence or jury tampering, and we cannot trust that the jury is capable of following this Court's instructions because it wholly ignored the important instruction to stay together, to keep this jury together, while deliberating.

## ARGUMENT

### A. The standard for a mistrial.

The Court "may declare a mistrial 'whenever, in [its] opinion, taking all the circumstances into consideration, there is a manifest necessity for doing so." *Renico v. Lett*, 559 U.S. 766, 773–74 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)). The Supreme Court has clarified "that the 'manifest necessity' standard cannot be interpreted literally, and that a mistrial

10

is appropriate when there is a high degree of necessity. The decision whether to grant a mistrial is reserved to the broad discretion of the trial judge, a point that has been consistently reiterated in decisions of this Court." *Id.* at 774 (internal quotation marks and citations omitted); *see also United States v. Sloan*, 36 F.3d 386, 393 (4th Cir. 1994) ("A trial court has 'broad discretion' in determining whether manifest necessity requires declaration of a mistrial.") (*quoting Illinois v. Somerville*, 410 U.S. 458, 462 (1973)); *see Shuler v. Garrison*, 631 F.2d 270, 272 (4th Cir. 1980) (finding grant of mistrial proper where "any verdict would have been suspect" because it was impossible "to ascertain what the jury, including the alternate juror, may have heard" outside the courtroom).

## B. A mistrial is warranted because the jury was not properly sequestered during deliberations.

A mistrial is warranted in this case because of the misconduct of Juror No. 6 in failing to remain sequestered with the jury during deliberations and thus violating the defendant's right to a properly sequestered jury and certainty respecting the integrity of the jury deliberation process. Deliberations do not end until the jury is actually discharged because at any point until that time the court has the discretion to send the jurors back to continue deliberations in order to modify an improperly completed verdict form, fill out a new verdict form, excuse a juror, seat an alternate or send the jury back to the jury room to deliberate anew. A verdict is valid and final when the deliberations are over, the result is announced in open court, and no juror registers dissent. *United States v. Love*, 597 F.2d 81, 85 (6th Cir. 1979). This conclusion is bolstered by Court rulings that address the polling provisions in FRCP 48(c), which provides that after a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity or lack of assent by the number of jurors that the parties stipulated to, the court may direct the jury to deliberate further or *may* order a new trial.

*See generally* 2 C. Wright, Federal Practice & Procedure, § 517, at 379 (2022) (civil verdict not final until announced, received by the court and recorded by the clerk).  *See also California Fruit Exchange v. Henry*, 89 F. Supp. 580, 588 (W.D. Pa.) ("All of the authorities agree that HN15 the only verdict is that which the jury announces orally in court, and which alone is received and recorded as the jury's finding); *Kramer v. Kister*, 187 Pa. 227, 40 A. 1008, 44 L.R.A. 432, *aff'd*, 184 F.2d 517 (3d Cir. 1950); *Mattice v. Maryland Casualty Co.*, 5 F.2d 233 (W.D. Wash. 1925) ("All the authorities agree that the only verdict is that which the jury announces orally to the court, and is received and recorded as the jury's finding).

Under Federal Rule of Civil Procedure 48, a jury must begin with at least 6 and no more than 12 members and each juror must participate in the verdict unless excused by the court for good cause.  Fed.R.Civ.P. 47(c).  "Good cause" may be found where there is sickness, family emergency, or juror misconduct that might occasion a mistrial.  *Id.* Comment to Rule 47(c).  Here, the Court did not excuse the juror at all, much less upon a finding of "good cause."  Both parties are entitled to a properly sequestered jury and that did not occur here because Juror No. 6 absented himself from the jury during the deliberations unbeknownst to the Court or even the Court Security Officers.  The system in place failed to protect the integrity of the process and effectively allowed a juror to separate from the jury in the midst of deliberations without being instructed about consulting outside sources of information as is normally done when the Court authorizes a break from deliberations.

There is no question that deliberations were still occurring.  Juror No. 5 made clear that the jury waited until Juror No. 6 returned to the jury room to open the Court's response to the jury's questions and then more discussion was had and the verdict sheet was then filled out and signed.  Jurors No. 7 and 9 indicated that once Juror No. 6 returned to the jury room, the jury reconfirmed

12

the verdict and then the verdict sheet was completed and signed by Juror No. 1. The misconduct of Juror No. 6 in violating the Court's directive that it must remain together during deliberations under the watchful eye of the CSO prejudiced the defendant's entitlement to a properly sequestered jury. Although Juror No. 6 told the Court that he went to get a sandwich and was only gone for 15 to 17 minutes from the jury room and talked to no one while absent, the varying accounts from all of the jurors as to the length of time Juror No. 6 was absent from the jury room and varying accounts as to where Juror No. 6 went upon leaving the jury room and when the verdict form was completed sows doubt as to the reliability of the jury deliberation process.

    The fact that Juror No. 6 did not respond to the CSO's inquiry regarding why he had left the jury room is not to be dismissed and casts more doubt about accepting at face value the juror's assurances that he talked with no one about the case or was exposed to no extraneous influence during his peregrinations. His account of his whereabouts, in terms of the duration of his absence and the fact that no other juror can say they personally witnessed him go to the café in the courthouse, leaves too much open to question as to whether, while moving unescorted through the courthouse without the presence of a CSO, Juror No. 6 was subject to an extraneous influence or took it upon himself to talk with others about the case or do research respecting the case. There is a presumption of prejudice where a juror consults outside sources. *United States v. Lawson,* 677 F.3d 629, 643-44 (4th Cir. 2012). .

    Under the circumstances, and although the Court has the discretion under Rule 59 of the Federal Rules of Civil Procedure as to whether to grant a mistrial, the disruption to the deliberations process and the misconduct of the juror in violating sequestration though explicitly told before the jury began its deliberations about the importance of deliberating together, warrants a mistrial.

**C. This jury cannot be relied upon to ignore the inflammatory remarks of Plaintiff counsel during closing argument.**

The fact of the violation, namely that Juror No. 6 absconded from the jury room, without having been excused and in contravention of the Court's instructions, calls into question the reliability of this jury to follow instructions, including to disregard improper arguments of counsel to which the Court had sustained Defendant's objection. This is particularly concerning here, where Plaintiff counsel made inflammatory comments during closing argument and in rebuttal which were not rooted in any evidence before the jury.

First, Plaintiff counsel commented on the credibility of the Defendant's witnesses, stating that they have a "great deal to lose" and could be disciplined by the Army should the Army be found liable for retaliation:

> **Ms. Campbell**: The defendant's witnesses, on the other hand, have a great deal to lose. Harm to their reputation. Some of them are still Army employees, so potentially disciplinary conduct – or actions rather, if Mr. McGriff's testimony about the things he says they engaged in are substantiated such as taking very long lunches –
> **Ms. DeShields**: Objection.

(Realtime Rough Transcript, 8/30/2022 Closing Arguments, attached as Defendant's Exhibit No. 2 at 2-3). The Court sustained the objection, admonishing Plaintiff counsel that there was no evidence in the record that any of the government's witnesses would face disciplinary consequences if somehow their testimony was inaccurate or not believed during the trial. (*Id.* at 3).

After the comment by Plaintiff counsel and the Defendant's objection, the Court announced to the jury "Objection sustained." It is unclear, based upon this jury's proven inability to follow the Court's instructions, that the jury disregarded these truly inflammatory, improper, and prejudicial comments from counsel which were not rooted in any evidence whatsoever. In fact,

14

many of the Army witnesses who testified at trial were not employees in the unit where Mr. Harris was assigned with witness Corry McGriff (Tania Robertson, Sarah Woods, and Colonel Jonathan Perez), or have since separated from the Army (General Jennifer Buckner (ret.), Major Mary Ross/Chantre (ret.), Bernard Porter). The notion that the witnesses on behalf of the Army were biased or were not to be believed because they could face discipline from the Army if the Army was found liable in the case stands in sharp contrast to the situation with McGriff, where the Army put on evidence showing his bias and lack of credibility through witness testimony and documentation of his removal. The fact that the jury ignored the Court's instruction that they must remain together in the jury room, and that no one could leave during their deliberations, and yet Juror No. 6 did anyway, calls into question whether this jury could be relied upon to disregard the improper comment that the defense witnesses might face discipline from the Army even after the objection had been sustained. *See Mosser v. Fruehauf Corp.*, 940 F.2d 77, 82-83 (4th Cir. 1991) (considering whether statement in closing argument "so poisoned the entire proceedings as to warrant a mistrial.").

Then, in rebuttal, Plaintiff counsel referred impermissibly to issues of damages which are not part of the case, and counsel for Defendant did not have an opportunity to respond because the issue was raised for the first time in rebuttal, as follows:

> Ms. Campbell: Dr. Word and Mr. Harris each testified about the harm that he suffered as a result of being fired. Defense counsel's argument that Mr. Harris didn't suffer any harm doesn't hold water. ***When a person is fired, the immediate consequences of that is no money. So of course you're going to have debt collection*** –
> Ms. DeShields: Objection.
> Ms. Campbell: -- ***tax issues*** –
> The Court: Sustained.

(Defendant's Exhibit No. 2 at 58).

15

Here, again, although the Court sustained the objection, how can we have any assurance that this jury, which has shown that it cannot follow instructions, disregarded the inflammatory remark by Plaintiff counsel, which invaded impermissibly into areas not to be decided by the jury at all, specifically any claim for economic damages, such as back pay or front pay. These issues were out of bounds for the jury, of which Plaintiff counsel was aware before the trial even began when the issue was bifurcated by the Court, and there is no assurance that the jury did not consider it, and Defendant had no opportunity to respond. *See Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 540 (2d. Cir. 1992) (reasoning that a new trial should be granted where the improper conduct of counsel in closing argument "causes prejudice to the opposing party and unfairly influences a jury's verdict.") (*citing* 11 Wright & Miller, Federal Practice and Procedure § 2809 (1973)); *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1308-09 (5th Cir. 1977) (reasoning mistrial should have been granted where counsel repeatedly disregarded order prohibiting reference to parallel state court proceedings and continued to do so in closing argument thereby precluding any rebuttal by plaintiff).

Under these circumstances, the Court cannot reasonably conclude that the comments by counsel did not affect the Defendant's substantial rights. Fed. R. Civ. P. 61; *see also Conway v. Chemical Leaman Tank Lines, Inc.*, 525 F.2d 927, 929-30 (5th Cir. 1976) (applying harmless error standard set forth in Fed. R. Civ. P. 61 and *Kotteakos v. United States*, 328 U.S. 750, 764 (1946) in civil case).

**D. The "blurt" by Juror No. 2 is another basis for a mistrial and shows that this jury is unreliable.**

During the *Remmer* evidentiary hearing, the Court instructed Juror No. 2 against revealing the substance of the jury's deliberations, and "what the verdict is or even allude to it." (Defendant's Exhibit No. 1 at 55). During the questioning regarding Juror No. 6 absconding from

16

the jury room and the course of events which had ensued while the jury was still deliberating, Juror No. 2 ignored the Court's instruction stating that Juror No. 1, the foreman, had "circled 'yes'" on the verdict sheet after Juror No. 6 returned from his frolic. (*Id.* at 60). The Court and counsel all agreed that Juror No. 2 had indeed revealed the jury's verdict during the questioning by the Court. (*Id.* at 62-63).

Federal Rule of Evidence 606, governing juror's competency as a witness, prohibits such testimony, as follows:

> **(b) During an Inquiry into the Validity of a Verdict or Indictment.**
> **(1) Prohibited Testimony or Other Evidence**. During an inquiry into the validity of a verdict or indictment, ***a juror may not testify about any statement made or incident that occurred during the jury's deliberations***; the effect of anything on that juror's or another juror's vote; ***or any juror's mental processes concerning the verdict or indictment***. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

FRE 606 (emphasis added). Here, Juror No. 2 plainly made statements concerning the jury's deliberation concerning the actual verdict, specifically the statement "yes" in relation to question no. 1 on the verdict sheet. This is in direct contravention of the rule, which precludes any inquiry or discussion of the manner in which the jury reaches a verdict and merits a mistrial in and of itself.

In addition, the failure by Juror No. 2 to follow the Court's instruction demonstrates another instance in which this jury is not reliable in following the Court's instructions. The Court was clear not to reveal the verdict or the process of reaching the verdict and Juror No. 2 did so anyway. The fact of this violation further supports that this jury cannot be credited with following the Court's instructions, deliberating together as a jury, and reaching a unanimous decision untainted by improper motive or outside influence.

**CONCLUSION**

For all of the foregoing reasons, Defendant respectfully requests that the Court grant a mistrial and set in a new trial.

>Respectfully submitted,
>
>Erek L. Barron
>United States Attorney

By:   _____/s/_____
>Evelyn Lombardo Cusson
>Tarra DeShields
>Assistant United States Attorney
>Federal Bar No. 13926
>36 S. Charles Street, 4th Floor
>Baltimore, MD 21201
>Phone: (410) 209-4833
>Fax: (410) 962-2310
>Evelyn.Cusson@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 1st day of September 2022, a copy of the foregoing Motion for Mistrial and for a New Trial was served on counsel of record via the Court's CM/ECF system.

>_____/s/_____
>Evelyn Lombardo Cusson
>Assistant United States Attorney