IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NAPOLEON HARRIS,                    *

    Plaintiff,                         *

    v.                                 *              CIVIL NO. JKB-18-3562

CHRISTINE WORMUTH, Secretary, U.S.  *
Department of the Army,

    Defendant.                         *

    *    *    *    *    *    *    *    *    *    *    *    *

**TABLE OF CONTENTS**

I.   Factual and Procedural Background ...................................................................1

   A.   Facts Adduced at Trial............................................................................2

      1.   Hiring and Tenure with the Army.......................................................3

         a.   Performance ...........................................................................5

         b.   Time and Attendance .............................................................7

         c.   EEO Contact.........................................................................12

         d.   Security Issues......................................................................15

            i.   Deer Path's Status as a SCIF ...................................15

            ii.   Assignment to Deer Path ..........................................16

            iii.   Leaving Deer Path Unattended.................................18

            iv.   Cell Phone Usage......................................................20

      2.   Termination......................................................................................22

      3.   McGriff's Testimony Regarding Plaintiff's EEO Complaint...........25

      4.   Damages...........................................................................................28

   B.   McGriff's Availability as a Witness.....................................................28

II.   Legal Standards.............................................................................................30

III.   Analysis.......................................................................................................32

   A.   Title VII Retaliation Claim..................................................................32

   B.   Denial of Defendant's Rule 50 Motion ................................................34

   C.   Grant of Defendant's Rule 59 Motion..................................................38

      1.   Credibility of Witnesses...................................................................39

      2.   Supervisors' Awareness of EEO Complaint Prior to Termination...43

      3.   Bases for Plaintiff's Termination.....................................................46

         a.   Time and Attendance and Performance Issues ....................47

         b.   Deer Path Incident...............................................................50

      4.   Additional Considerations ...............................................................56

         a.   Distinguishing Retaliation from Other (Improper) Motivations...................56

         b.   Alleged Juror Misconduct....................................................58

IV.   Conclusion....................................................................................................58

**MEMORANDUM**

Following a jury trial in this case, the jury returned a verdict in favor of Plaintiff Napoleon Harris against Defendant the Department of the Army, Plaintiff's former employer. Pending before the Court is Defendant's Motion for Judgment as a Matter of Law or for a New Trial. (ECF No. 163.) Defendant seeks judgment as a matter of law in its favor pursuant to Federal Rule of Civil Procedure 50(b), arguing that there was legally insufficient evidence for the jury to find in favor of Plaintiff. Alternatively, Defendant argues that the Court should grant a new trial pursuant to Rule 59 because the jury's verdict is against the clear weight of the evidence. Defendant also argues that the Court should grant a new trial pursuant to Rule 59 given the admission of the deposition testimony of a witness at trial, statements made by Plaintiff's counsel during closing arguments, and juror misconduct, or that the Court should grant a new trial nisi remittitur.

The Motion is fully briefed and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, the Court will grant Defendant's Motion to the extent that it seeks a new trial pursuant to Rule 59 based on the weight of the evidence, and will deny it in all other respects.

## I.   *Factual and Procedural Background*

Plaintiff Napoleon Harris filed suit against the Department of the Army on November 19, 2018, bringing claims of discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* (ECF No. 1.) After the Court granted in part and denied in part Defendant's Motion to Dismiss, only Plaintiff's retaliation claim survived. (ECF Nos. 20, 21)

Thereafter, the Court denied Defendant's Motion for Summary Judgment, (ECF Nos. 79, 80), and the case proceeded to trial.

1

## A. Facts Adduced at Trial

A jury trial commenced in this Court on August 22, 2022. Plaintiff called four witnesses: Plaintiff himself, Lorenzo Artis, Corry McGriff,[1] and Tharis Word. Artis and McGriff were contractors who worked with Plaintiff during his time at the Army. Artis worked with Plaintiff for a few days and McGriff worked with Plaintiff for approximately six months. Word is a friend of Plaintiff's who testified regarding Plaintiff's non-economic damages.

Defendant called 13 witnesses. Their roles are described in more detail below as needed, but briefly, Michael Young and Mary Ross[2] were Plaintiff's first-line civilian supervisor and second-line military supervisor, respectively. Jennifer Buckner, Jennifer Chapman, and Gregory Platt were part of leadership for the 780th Military Intelligence Brigade, the military unit in which Plaintiff was employed. Bernard Porter and Angela Ponder were Plaintiff's colleagues. William Connor, Juawan Cann, and Jonathan Perez were also Army employees, though not in the same unit as Plaintiff. Dennis Pechan,[3] Tania Robertson, and Sara Woods worked in Human Resources.

In brief, and as described more fully below, Plaintiff was employed by the Army beginning on March 12, 2012. The witness testimony and documentary evidence generally reflect that Plaintiff had performance and time and attendance issues during his tenure. Plaintiff filed an Equal Employment Opportunity ("EEO") complaint on July 15, 2013. On July 25 and 26, 2013, Plaintiff was assigned to work at a facility called Deer Path and witnesses testified that Plaintiff committed a security violation while working there. Plaintiff was terminated on August 7, 2013.

---

[1]       As described in more detail below, selections from McGriff's deposition transcript were read into the record, as the Court found that he was an unavailable witness pursuant to Federal Rule of Evidence 804(a)(5).

[2]       Major Mary Ross is currently known as Dr. Mary Chantre. The Court refers to her as Major Ross throughout this Memorandum, as the other witnesses uniformly referred to her in this way.

[3]       Pechan testified via a videotaped de bene esse deposition.

2

The jury rendered its verdict on September 1, 2022. (ECF No. 151.) The jury found in favor of Plaintiff and awarded him $300,000 in non-economic damages. (*Id.*) The facts adduced at trial are as follows.

## 1. Hiring and Tenure with the Army

Plaintiff was employed by the Army beginning on March 12, 2012. (Tr. Vol. II-37:2–4 (by stipulation), ECF No. 167.) He was initially assigned to the 781st Military Intelligence Battalion, a subordinate unit of the 780th Military Intelligence Brigade. (Tr. Vol. III-91:6–7 (Platt), ECF No. 168.) He was a probationary employee during his employment, (Tr. Vol. II-139:2–4 (Harris)), meaning that the Army could terminate him "within two years if [he was] not meeting the job qualifications or if [he was] exhibiting disciplinary behaviors that are not conductive [sic] to [the Army's] mission." (Tr. Vol. III-96:23–97:2 (Platt); *see also* Tr. Vol. III-155:2–5 (Young testifying that the Army "can essentially release [a probationary employee] for any reason that we determine [is] not an EEO-involved incident").)

Between March 2012 and December 2012, Plaintiff was an Intelligence Specialist with the 781st Military Intelligence Battalion. (Tr. Vol. II-49:5–6 (Harris).) In November 2012, Plaintiff took and failed the Remote Operations Center ("ROC") test. (Tr. Vol. II-49:10–25 (Harris).) He was then slated for termination. (Tr. Vol. II-50:18–20 (Harris); Def. Ex. 60 (December 12, 2012 letter "provid[ing] substantiation for the discharge of Mr. Napoleon Harris" and noting "after eight months of training worth over $20,000 [ ], Mr. Harris failed the ROC assessment and did not qualify for interactive operations").)

Following a meeting with members of the 780th Military Intelligence Brigade's leadership, however, Plaintiff was reassigned to a different role rather than terminated. (Tr. Vol. II-51:22–25 (Harris); Tr. Vol. II-91:20–23 (Platt testifying that he had "intervened to provide a second

opportunity for [Plaintiff]").)

Plaintiff was detailed to the 780th Military Intelligence Brigade S6 unit. (Tr. Vol. III-91:20–23 (Platt).) The S6 unit was responsible for information technology for the 780th Military Intelligence Brigade.[4] (Tr. Vol. III-101:19–20 (Platt).) In his position with the S6, Plaintiff's role was to "maintain and configure the network devices for the 780th Military Intelligence Brigade." (Tr. Vol. II-58:13–15 (Harris).) His first-line civilian supervisor was Young and his second-line military supervisor was Ross. (Tr. Vol. II-57:3–8 (Harris).) Ross was the "Brigade S6" which "mean[t] that [she] was the staff lead" in the 780th Military Intelligence Brigade S6 unit. (Tr. Vol. IV-30:13–22 (Ross), ECF No. 165.)

Plaintiff was detailed to the S6 rather than formally reassigned "[b]ecause of his struggles in the duties at 781st." (Tr. Vol. III-97:8–22 (Platt also explaining that "we decided we were going to do a 30-, 60-, 90-day review to see if he was actually capable of being successful in the network shop within the S6").) Plaintiff's grade and salary did not change when he was detailed to the S6. (Tr. Vol. III-98:12–20 (Platt).)

Plaintiff was ultimately terminated on August 7, 2013. (Tr. Vol. II-37:2–4 (by stipulation).) His termination letter explained that he was being terminated due to: (1) repeated time and attendance issues; (2) security violations within a Secure Compartmented Information Facility ("SCIF"); and (3) performance issues. (Pl. Ex. 5 (Aug. 7, 2013 Memorandum re: Discharge During Trial Period ("Termination Letter").) These issues, as well as Plaintiff's EEO complaint, are described in more detail below.

---

[4]     There existed several units: "S1 is the HR office, both responsible for military and civilian accounts and pay and things like that that are associated with civilians. The S2 is the security office so the clearances and accesses to facilities would be done through them. S3 is operations and training. S4 is logistics. S6 is the information technology, and then the resource management office does the travel cards and money things." (Tr. Vol. III-101:15–21 (Platt).)

4

### a. Performance

Both parties adduced evidence about Plaintiff's performance during his time with the 780th Military Intelligence Brigade S6. Young prepared a 30-, 60-, and 90-day plan in January 2013 outlining duties and tasks for Plaintiff. (Tr. Vol. III-140:23–25, 141:19 (Young); Def. Ex. 5 (Performance Plan for Mr. Harris).) Young presented this plan to leadership but did not send it to Plaintiff, although he testified that he discussed the nature of Plaintiff's duties with him. (Tr. Vol. III-141:20–25 (Young).)

Plaintiff testified that he was a proactive and effective employee. (See, e.g., Tr. Vol. II-57:11–58:8 (Harris testifying regarding various projects he successfully completed); Tr. Vol. II-65:20–22 (Harris testifying that, around the week of July 1, 2013, Ross had asked him "to consider shadowing Michael Young to perform deputy director duties").) Two of Plaintiff's witnesses—Artis and McGriff—also testified that Plaintiff was an effective and helpful employee. (See, e.g., Tr. Vol. II-176:16–18 (Artis testifying that he worked with Plaintiff for a two or three day period and that Plaintiff was "very knowledgeable" and "very helpful"); Tr. Vol. III-14:9–16 (McGriff referring to Plaintiff as "the fixer" and explaining that he was "called on" for "a lot of things" and that he had "technical savvy").) One of Defendant's witnesses agreed that at one point Plaintiff fixed a connectivity issue. (Tr. Vol. IV-108:25–109:4 (Porter).)

Defendant's witnesses, on the other hand, testified that Plaintiff had various performance deficiencies. Plaintiff's supervisors—Ross and Young—testified to these issues. For example, in a 90-day evaluation dated April 12, 2013, Young noted that Plaintiff had been assigned various tasks, but that he "ha[d] not satisfactorily accomplished these tasks"; that Plaintiff "ha[d] become complacent in reaching out to find new tasks and expand his role with the [Brigade]"; that Plaintiff "ha[d] not stepped up to take the leadership role as he is expected to with his grade"; and that

Young "would not recommend that [Plaintiff] continue in his role with the S6 staff section." (Def. Ex. 8 (Apr. 12, 2013 Evaluation of Napoleon Harris).) Young testified that he did not share this memorandum with Plaintiff because Plaintiff was only detailed (and not formally assigned) to the S6, and the purpose of the memorandum was to provide leadership with an evaluation of Plaintiff. (Tr. Vol. III-151:24–152:13 (Young).) Ross testified that Young told her that he believed that Plaintiff should not continue in the S6 around the time of the 90-day evaluation, and that it was her understanding that Young counseled Plaintiff regarding performance deficiencies. (Tr. Vol. IV-41:8–16, 70:14–22 (Ross).) Ross testified that she was "surprised" to learn that Plaintiff had a grade level of GS-13, "based on his performance" and his "unwillingness to step up . . . to be the deputy or to assist in the shop." (Tr. Vol. IV-43:1–13 (Ross).)

In June 2013, Plaintiff received a midyear assessment from Young. (Tr. Vol. III-154:4–7 (Young).) Young did not tell Plaintiff that he thought Plaintiff should not continue in his role in the S6 because it "was not [his] call to make and that was a management command decision." (Tr. Vol. III-154:10–15 (Young).) However, he recalled reviewing Plaintiff's time and attendance, reviewing some of the technical aspects of the job, and telling him to be more proactive and involved with the staff. (Tr. Vol. III-154:16–21 (Young).) Plaintiff, on the other hand, testified that Young told him that he "was doing a great job, good job, keep it up" during his midyear review. (Tr. Vol. II-110:12–23 (Harris).) Plaintiff testified that Young did not tell him he had performance deficiencies. (Tr. Vol. II-111:9–112:7 (Harris).)

The Defendant elicited testimony that Brigade leadership was aware of Plaintiff's performance deficiencies. Chapman—the deputy commander and chief of staff for the 780th Military Intelligence Brigade—testified that, after approximately two months with the S6, Young and Ross "started sharing that they had some concerns with [Plaintiff]" and that the nature of those

6

concerns included "work performance in general, and kind of a lack of a proactive approach to the work they were giving him." (Tr. Vol. III-127:15–22 (Chapman).) Buckner—the commander of the 780th Military Intelligence Brigade—testified that Plaintiff "conveyed to [her] that he didn't like Mr. Young telling him what to do" and "[h]e expressed his dissatisfaction with the structure and discipline of his work in the S6." (Tr. Vol. V-74:6–7, 23–24 (Buckner), ECF No. 169.)

Further, McGriff testified on direct examination that no one ever complained about Plaintiff's work. (Tr. Vol. III-13:21–14:4 (McGriff).) On cross examination, however, he testified that he heard Ross discuss Plaintiff's work ethic and performance more than ten times in June and July 2013 and that he would email Plaintiff "Code Red" if he overheard others negatively discussing Plaintiff's whereabouts, performance, or work ethic. (Tr. Vol. III-38:12–20, 41:9–20 (McGriff).) He testified that, beginning in the April 2013 time period, Ross would say things like: "he's not proficient at his job,' and 'he don't understand what he's doing,' and things like that." (Tr. Vol. III-53:7–19 (McGriff).)

### b. Time and Attendance

Much of the evidence adduced at trial related to Plaintiff's time and attendance. Plaintiff frequently visited family in Georgia over the weekend and traveled by train, which often caused him to arrive late to work—at around 10:00 a.m. to 11:00 a.m.—at the beginning of the week.[5] (Tr. Vol. II-60:1-6 (Harris).) Plaintiff testified that he received approval from Young and Ross to arrive late and to work late on the days when he travelled back from Georgia. (Tr. Vol. II-60:24–61:1 (Harris).) Young testified that Plaintiff did not have standing approval to arrive late whenever he traveled from Georgia. (Tr. Vol. III-147:5–14 (Young).) Ross also testified that she "did not

---

[5]   Plaintiff testified that, in February 2013, he was on a turbulent flight and thereafter only traveled to Georgia by train. (Tr. Vol. II-59:18–25 (Harris).)

give him permission to do that whenever he was coming back, just for that one time." (Tr. Vol. IV-40:6–11 (Ross).)

Young testified that, after observing that Plaintiff was arriving late at the beginning of the workweek, Young suggested a compressed work schedule to accommodate the travel, which would allow Plaintiff to have three-day weekend every two weeks. (Tr. Vol. III-143:23–24, 144:10–14 (Young).) Young recalled that the compressed schedule went into effect in March 2013. (Tr. Vol. III-145:18–20 (Young).)

Young and Ross testified that Plaintiff's attendance did not improve following his schedule change. (Tr. Vol. III-155:6–10 (Young); Tr. Vol. IV-38:16–18 (Ross).) Young attempted to counsel Plaintiff verbally and would let Plaintiff make up the time by working later in the day. (Tr. Vol. III-155:18–25 (Young).) Young explained that he eventually spoke "with the civilian personnel office to find out what can be done and the best way to document it and also spoke with leadership . . . on the best way to document it." (Tr. Vol. III-156:7–10 (Young).)

Other members of the S6—Porter and Ponder—testified that they observed Plaintiff's lateness and that Young and Ross would inquire as to Plaintiff's whereabouts. (Tr. Vol. IV-88:14–90:22 (Porter); Tr. Vol. IV-123:7–14 (Ponder).) Porter testified that Plaintiff's lateness impacted morale and caused others to have to step in and do Plaintiff's work. (Tr. Vol. IV-90:25–92:19 (Porter).) Ross explained that his late arrivals affected the team, as the "shop was stretched pretty thin." (Tr. Vol. IV-39:8–13 (Ross).)

Members of leadership and human resources also testified about Plaintiff's poor time and attendance. Platt—the "senior civilian advisor" and a "member of the command team" (Tr. Vol.

III-88:21–22)[6]—testified that Plaintiff "began to demonstrate lateness and absenteeism that caused concern with [Young]" after about a month with the S6 and that this was a "pattern of behavior." (Tr. Vol. III-104:1–8 (Platt).)   Chapman testified that issues with Plaintiff's attendance were reported to her on multiple occasions. (Tr. Vol. III-128:14–25 (Chapman).) She recalled that she told Young that he had to address these issues. (Tr. Vol. III-129:17–25 (Chapman).) Buckner testified that she received informal updates and feedback that Plaintiff was not adhering to time and attendance policies.   (Tr. Vol. V-70:7–25 (Buckner).)   She also testified that Plaintiff expressed his dissatisfaction to her with the structure and discipline of his work with the S6, and that "[h]e did not like that Mr. Young and Major Ross . . . didn't afford him some of the flexibility that he wanted around his work schedule." (Tr. Vol. V-73:25–74:10 (Buckner).)

Robertson—an administrative support assistant in the human resources department for the 781st Military Intelligence Battalion, (Tr. Vol. IV-10:17 (Robertson))—testified that Young asked her for options to respond to the issues surrounding Plaintiff's absences, given his travel to and from Georgia. (Tr. Vol. IV-19:4–14 (Robertson).)   Robertson testified that Young "tried to exhaust the many opportunities, many of the different work schedules to accommodate the employee." (Tr. Vol. IV-20:13–18 (Robertson); *see also* Tr. Vol. IV-21:3–6 (Robertson testifying that she had to change Plaintiff's schedule in the system "three or four times").)   She also testified that Plaintiff approached her about the time and attendance policies; that he "express[ed] some dissatisfaction" with the policies; that he was "burning leave faster than he was earning leave"; and that her impression was that he believed that the Army "shouldn't have a leave policy at all." (Tr. Vol. IV-22:6–23:1 (Robertson).)   Woods—the head civilian personnel specialist within the

---

[6]   In that role, his "primary responsibility is to advise the commander on all matters related to civilian talent management, as well as the strategic planning and forward growth of the organization." (Tr. Vol. III-88:22–25 (Platt).)

780th Military Intelligence Brigade, (Tr. Vol. VI-35:20–22 (Woods), ECF No. 170)—testified that Young conveyed to her in March through July 2013 that there were many instances where Plaintiff's leave submissions were not accurate or timely. (Tr. Vol. VI-40:4–6 (Woods).)

McGriff testified that Ross complained about Plaintiff coming in to work late. (Tr. Vol. III-27:16–18 (McGriff).) He testified that Ross began asking about Plaintiff's whereabouts around April 2013. (Tr. Vol. III-53:7–12 (McGriff).) He would email Plaintiff "Code Red" when Ross and Young complained that they did not know where Plaintiff was. (Tr. Vol. III-41:21–24 (McGriff).)

On June 17, 2013, Plaintiff arrived late to work. Plaintiff testified that Young and Ross had approved his late arrival, but that Young required him to take leave without pay for the time that he was late. (Tr. Vol. II-72:18–73:10 (Harris).) Young testified that the time was documented as leave without pay because Plaintiff had not requested leave in advance. (Tr. Vol. II-156:19–157:5 (Young).)

On July 3, 2013, Plaintiff emailed Young: "As discussed, this is a reminder that I'll be in between 10 and 11 Tuesday morning due to" travel from Georgia. (Pl. Ex. 8 (Email re: Return time for Tuesday).) Young responded on July 5, 2013: "I have a problem with this. The whole point of you choosing to have off on Monday's [sic] was to make it in on time Tuesday's [sic]. I cannot approve leave when you could plan to return to the area the day before." (*Id.*) Plaintiff testified that he did not see the email from Young until July 9 or 10, 2013. (Tr. Vol. II-75:9–10 (Harris).) On July 9, 2013, Plaintiff arrived even later to work than anticipated because his train from Georgia was delayed. (Tr. Vol. II-73:15–19 (Harris).) Young instructed Plaintiff to use the code for leave without pay, although Plaintiff had annual leave available to use. (Tr. Vol. II-

10

77:18–25 (Harris).)[7]

Platt conducted meetings as a result of this July 9 incident on July 15.[8] Platt organized a meeting with the S6 to discuss time and attendance because Plaintiff indicated that others within the S6 were not adhering to time and attendance policies. (Tr. Vol. III-107:16–24 (Platt).) Porter and Ponder—the other members of the S6—believed that the meeting was held due to Plaintiff's attendance issues. (Tr. Vol. IV-122:20–25, 132:1–16 (Ponder); Tr. Vol. IV-94:10–18 (Porter).) Plaintiff was not in attendance at this meeting, as he was filing a complaint with the EEO office. (Tr. Vol. II-82:4–82:9 (Harris).)

Later that day, Plaintiff, Young, and Platt had a meeting. Platt used it as an opportunity "to educate both the supervisor and the employee on what should have occurred" and asked Young to change the absent without leave designation to annual leave, as Plaintiff had available leave. (Tr. Vol. III-106:6–24 (Platt); Tr. Vol. II-80:5–9, 83:6–15 (Harris).) Platt described the decision to allow Plaintiff to use annual leave as "lenient." (Tr. Vol. III-106:23–107:1 (Platt); *see also* Tr. Vol. III-167:9–12 (Young testifying that "Mr. Platt . . . was just trying to give Mr. Harris a break. He wanted -- he was trying to do, like all of us, to try to make it as best he could for the situation that he was in").) When Platt reviewed the time and attendance policies with Plaintiff, Plaintiff

---

[7]    Young memorialized this incident in a Memorandum for Record titled "Absent Without Leave (AWOL) – Napoleon Harris" which is dated March 6, 2014. (Def. Ex. 14 (March 6, 2014 Memorandum re: Absent Without Leave (AWOL) – Napoleon Harris).) This memorandum indicates that Plaintiff emailed Young on July 3, 2013; that Young did not read the email until July 5, 2013; that Plaintiff stated in the email that he would be reporting to work late on July 9, 2013; that Plaintiff had not submitted a leave form for July 9, 2013; that Young told Plaintiff that he would be coded as AWOL for that day; that Plaintiff disagreed with him; and that Young informed him that he could pursue his disagreement with the command group. (*Id.*)

    Young testified that he prepared the memorandum in July 2013, (Tr. Vol. III-163:23–25 (Young)), but the document is dated March 6, 2014. (Def. Ex. 14.) He explained that, when documents are accessed, the current date is populated into the document and that this new date (March 6, 2014) was populated on the document when he accessed it "to present to the court and the investigator." (Tr. Vol. III-164:8–12 (Young).)

[8]    Platt also recalled a meeting occurring between himself, Plaintiff, and Young on July 9, 2013. However, Plaintiff and Young did not testify regarding a July 9 meeting. In any event, the exact timing of the meetings is not pertinent.

asked him: "So are you just going to now follow me into the restrooms?" (Tr. Vol. III-110:7–13 (Platt); Tr. Vol. III-166:25–167:1 (Young testifying that Plaintiff said something like "I'll be sure to tell you when I go to the bathroom.").)[9]

Plaintiff testified that he had no further issues regarding time and attendance after this meeting until the time he was terminated. (Tr. Vol. II-85:3–10 (Harris).)

### c. EEO Contact

The parties stipulated that Plaintiff contacted an EEO counselor on July 15, 2013. (Tr. Vol. II-36:25–37:1 (by stipulation).) He did so because he felt he was being singled out with respect to time and attendance and that he "was being harassed or discriminated against based on age, race, or color in a hostile work environment." (Tr. Vol. II-81:3–5 (Harris).)[10]

Young testified that he was not aware of Plaintiff's EEO complaint when he was terminated in August 2013. (Tr. Vol. III-176:17–20 (Young).) He testified that he learned of the complaint "[i]n October of 2013 when we were called by the investigators." (Tr. Vol. III-176:21–24 (Young).) Ross likewise testified that she was not aware of Plaintiff's EEO complaint when she recommended that he be terminated, and that she believed that she became aware of the complaint around October 2013 when an investigation was conducted into the complaint. (Tr. Vol. IV-

---

[9]     Young memorialized this meeting in a July 31, 2013 Memorandum for Record titled "Counseling session for Napoleon Harris on July 15, 2013." (Def. Ex. 16 (Memorandum re: Counseling session for Napoleon Harris on July 15, 2013).) It explains that there was a meeting with Platt on July 15, 2013 at which all staff other than Plaintiff were present; that Platt reviewed the timekeeping procedures with Plaintiff when he returned; that Plaintiff "made comments that were disrespectful to Platt" and that Platt "took these comments in stride but pointed out to [Plaintiff] that this is the issue that shows he lacks conviction to the job"; and that Platt determined that Plaintiff should use annual leave, rather than AWOL for the July 9 absence. (Id.)

There are two identical versions of this document: one is dated March 6, 2014 and the other is dated December 12, 2013. (Id.) Young testified that he created this document in July 2013, shortly after the counseling session with Platt, and that the dates on the documents are a function of when they were accessed, as described above. (Tr. Vol. III-168:9–10 (Young).)

[10]     As noted above, the Court dismissed Plaintiff's discrimination and hostile work environment claims.

52:16–53:8 (Ross).)

Plaintiff, on the other hand, testified that he informed Ross and Young of the EEO complaint prior to his termination. He testified that he informed Young and Platt during the July 15, 2013 meeting. (Tr. Vol. II-83:19–25 (Harris).) Young, however, testified that Plaintiff did not give him a reason for his absence, (Tr. Vol. III-183:3–7 (Young)), and Platt testified that, when he asked Plaintiff where he had been during the meeting with the rest of the S6 staff, Plaintiff "indicated that he had an appointment" but did not explain the nature of the appointment. (Tr. Vol. III-109:12–21 (Platt).) Platt also testified that, during the meeting with the rest of the S6 staff, "[n]o one at that time knew [Plaintiff's] location." (Tr. Vol. III-109:1 (Platt); *see also* Tr. Vol. IV-93:24–25 (Porter explaining that he understood that Plaintiff was not at the meeting "[b]ecause it was on a Monday"); Tr. Vol. IV-121:20–24 (Ponder testifying that Plaintiff did not attend the meeting, and she did not know why Plaintiff did not attend).)

Plaintiff also testified that he informed Ross about his EEO complaint on or around July 22, 2013. (Tr. Vol. II-84:7–16 (Harris).) He explained that, when he told Ross, "she told [him] she couldn't stop [him] from doing it if [he] felt like [Young] was discriminating against [him]; she couldn't stop [him] from going through that process." (Tr. Vol. II-84:22–85:2 (Harris); *see also* Pl. Ex. 35 (August 23, 2013 email from Plaintiff explaining to Jeffrey McClendon[11] that he made Ross aware of his EEO complaint against Young during a meeting).)

An EEO counselor's report, dated August 15, 2013, was entered into evidence. (Def. Ex. 17 (EEO Counselor's Report).) No witness testified about this document, and it was presented to the jury for the first time during Plaintiff's closing argument. (Tr. Vol. VI-65:3–67:17 (Plaintiff's

---

[11]    No one testified as to McClendon's role. However, he appears to be an EEO counselor. (*See* Def. Ex. 17 (EEO Counselor's Report).)

Closing).)  The report describes Plaintiff's July 15, 2013 EEO complaint.  (Def. Ex. 17 (EEO Counselor's Report).)  Under the heading "Witness Inquiry," Young is listed as a witness.  (*Id.*) The document also includes "Witness Statements" and, with respect to Young, notes: "Mr. Harris was continuously late due to going back to Georgia by train and was counseled on it.  Was marked AWOL because Mr. Harris requested leave and was denied and he still left."  (*Id.*)

There is also a letter dated August 2013 addressed to Young, which sets out the general EEO complaint investigation process.  (Pl. Ex. 11 (August 2013 Memorandum to Young re: Responding Management Official – Participation in Complaint Processing).)  It does not contain any specific reference to Plaintiff or his EEO complaint.  (*Id.*)  The letter includes spaces for the signatures of "Responding Management Official" and "Counselor," but the letter is unsigned.  (*Id.*) Ross and Platt received similar letters (outlining the process and not specifically referencing Plaintiff), but those letters are signed and dated.  (*See* Def. Ex. 56 (September 9, 2013 Memorandum to Ross re: Responding Management Official – Participation in Complaint Processing reflecting that Ross signed the letter as the "Responding Management Official" and that McClendon signed the letter as the "Counselor" on September 10, 2013); Def. Ex. 57 (Memorandum to Platt re: Responding Management Official – Participation in Complaint Processing reflecting a signature, presumably Platt's,[12] for the "Witness" and McClendon's signature for the "Counselor" dated September 9, 2013).)

Other witnesses also testified that they were not aware of Plaintiff's EEO complaint before he was terminated.  (Tr. Vol. IV-106:13–20 (Porter); Tr. Vol. V-78:3–10 (Buckner).)  However, and as discussed below, McGriff suggested that there were conversations regarding the complaint

---

[12]    No witness testified regarding this document and the signature is not clearly Platt's.  However, the Court presumes that the signature is Platt's, given that the letter is addressed to him.

within the S6 prior to Plaintiff's termination. (*See, e.g.*, Tr. Vol. III-19:24–20:7 (McGriff).)

### d.  Security Issues

Around July 2013, the S6 was involved in setting up the information technology in a facility called Deer Path.  (Tr. Vol. IV-48:7–12 (Ross testifying that the S6 was "setting up the network"; "dropping all the landlines"; "setting up the phones"; and "making sure that the building was secure.").)  Deer Path's status as a SCIF and whether Plaintiff committed a security violation at Deer Path were discussed at length at trial, as described below.

### i.  Deer Path's Status as a SCIF

A SCIF is "is an accredited area, room, group of rooms or buildings, or installation where [Sensitive Compartmented Information ("SCI")] may be stored, used, discussed, and/or electronically processed."   (Pl. Ex. 17 (780th Military Intelligence Brigade Sensitive Compartmented Information SOP for Sensitive Compartmented Information Facilities ("SCIF SOP")).)  SCI is "classified information concerning or derived from intelligence sources, methods or analytical processes, which is required to be handled exclusively within formal control systems established by the Director of Central Intelligence."  (*Id.*)  In addition, to access a SCIF, a person must have proper clearance.  (Tr. Vol. IV-47:6–7 (Ross).)  Plaintiff had a top secret security clearance during his time with the Army.  (Tr. Vol. II-124:15–20 (Harris).)  His clearance had a "special designation, SCI[.]" (Tr. Vol. II-124:21–125:3 (Harris).)  As Platt explained, "[t]o be able to have access to SCI, you go through a special briefing and training to identify the requirements of how you handle SCI information."  (Tr. Vol. III-103:3–8 (Platt).)  That training would also include access to SCIFs.  (Tr. Vol. III-103:9–11 (Platt).)

The witnesses—other than Plaintiff, Artis, and McGriff—uniformly testified that Deer Path was a SCIF in July 2013.  (Tr. Vol. III-172:18–21 (Young); Tr. Vol. IV-47:3–9 (Ross); Tr.

15

Vol. IV-101:7–9 (Porter); Tr. Vol. IV-117:15–16 (Ponder); Tr. Vol. IV-145:20–22 (Cann); Tr. Vol. V-40:11–12 (Connor).) Defendant's Exhibit 36 indicated that Deer Path was "reaccredited as a" SCIF as of February 2013. (Def. Ex. 36 (Facility Reaccreditation).) Young testified that he believed that the fact that Deer Path was a SCIF was discussed in meetings at which Plaintiff was present. (Tr. Vol. III-174:22–25 (Young).)

Plaintiff, on the other hand, testified that Deer Path was not a SCIF and that it was "an empty facility, abandoned building." (Tr. Vol. II-86:7–23 (Harris).) Artis testified that, in July 2013, Deer Path was not a SCIF, but that it became a SCIF later. (Tr. Vol. II-171:18–172:1, 175:10–14 (Artis).) However, when shown Exhibit 36, Artis agreed that the document reflected that Deer Path was reaccredited as a SCIF as of February 2013. (Tr. Vol. II-184:1–3 (Artis).) McGriff testified that the facility was not a SCIF, (Tr. Vol. III-29:23 (McGriff)), but—as discussed in more detail below—it is likely that McGriff was discussing a different facility, not Deer Path.

### ii.   Assignment to Deer Path

On July 23, 2013, Young emailed Plaintiff: "We need your assistance at DeerPath Wednesday afternoon . . . We need someone to be able to open the building in the morning and close it in the evening . . . Get the with the S2 for access control instructions." (Def. Ex. 18 (Email re: DeerPath Escrot [sic]).) Plaintiff responded that he would "speak with Juawan [Cann] in S2." (*Id.*) Cann was a civilian employee of the 780th Military Intelligence Brigade S2, the unit that handled intelligence and security, and was a security specialist. (Tr. Vol. IV-141:1–9 (Cann).) Plaintiff testified that his role at Deer Path was to "work with [the TROJAN[13] technician, Artis] to get . . . the 780th Brigade network up and going" and to assist other S6 members as needed. (Tr. Vol. II-88:1–12 (Harris).) Young testified that he provided no guidance beyond this email and,

---

[13]   TROJAN is a classified network used by the Army. (Tr. Vol. III-173:24–174:2 (Young).)

when asked whether he told Plaintiff that the facility was a SCIF, explained that he did not "believe [he said] those exact words" but that he did not remember. (Tr. Vol. III-174:8–14 (Young).)

Plaintiff spoke with Cann to get the codes to open and close the area where computers were housed at Deer Path. (Tr. Vol. II-89:19–24 (Harris).) Plaintiff testified that he was not provided with any additional information. (Tr. Vol. II-94:3–5 (Harris).) Cann, however, testified that he reminded Plaintiff of the "dos and don'ts" for a SCIF, such as that cell phones and other wireless technology was not permitted. (Tr. Vol. IV-156:17–157:6 (Cann).) Cann testified that Plaintiff was not happy about opening and closing the facility and that Plaintiff "felt like it was something that was not part of his job or responsibility." (Tr. Vol. IV-157:23–158:3 (Cann).)

The SCIF SOP indicates that "[e]ach individual assigned to work inside a SCIF must read this SOP and certify in writing annually they understand and will comply with the established security processes, actions and procedures." (Pl. Ex. 17 (SCIF SOP).) The witnesses uniformly testified that they did not provide Plaintiff with a copy of the SCIF policy at this time, nor did they require him to sign or certify that he had reviewed the SCIF policy. (Tr. Vol. II-94:16–24 (Harris); Tr. Vol. III-181:21–182:1 (Young); Tr. Vol. IV-64:11–67:4 (Ross); Tr. Vol. V-51:25–52:11 (Connor); Tr. Vol. IV-161:12–25 (Cann).) Platt testified that, as part of Plaintiff's onboarding in his role with the S6, he was to complete certain items for each unit in the 780th Brigade, which would have included training with the S2 regarding SCIFs and accessing SCIFs. (Tr. Vol. III-102:16–103:11 (Platt); Def. Ex. 7 (new employee welcome letter indicating, *inter alia*, that new employees were to complete onboarding with each unit, including the S2).) He also testified that it would be "completely out of security practice" for Plaintiff to have not confirmed that he read and understood the SCIF policy. (Tr. Vol. III-113:3–8 (Platt).)

17

### iii.  Leaving Deer Path Unattended

Perez was the communications officer for the 781st Military Intelligence Battalion, the subordinate unit for the 780th Military Intelligence Brigade. (Tr. Vol. VI-19:6–12 (Perez).) Perez was the S6 for that organization, and therefore was Ross's counterpart on the Battalion level. (Tr. Vol. IV-49:18–19 (Ross); Tr. Vol. VI-19:6–17 (Perez).)   Perez worked with Plaintiff when Plaintiff was assigned to work at Deer Path. (Tr. Vol. VI-20:20–24, 23:20–24:23 (Perez).)

Perez testified that it was important for personnel to remain in the facility because "there [were] encryption devices as the network was being tested with live communications keys" and that it "could be adversely harmful to the organization if those were either jeopardized or acquired by anyone outside the approved clearance." (Tr. Vol. VI-26:1–5 (Perez).) Perez recalled that there was a time when he and another employee were leaving to get lunch, and Perez therefore:

> [I]nstruct[ed] Mr. Harris that somebody has to remain with the facility to secure the encryption devices and that [Perez and the other employee] would return in about 30 minutes to an hour and then [they] would . . . rotate with Mr. Harris upon [their] return.  [They] would then, in turn, guard the equipment while [Mr. Harris] went and got some lunch to ensure that there was physical security at all times.

(Tr. Vol. VI-25:12–23 (Perez).) Perez explained that his instructions were "very specific: We will maintain personnel for physical security.  Upon our return, you can then go to lunch." (Tr. Vol. VI-26:23–25 (Perez).) Perez testified that Plaintiff confirmed that he would remain in the facility. (Tr. Vol. VI-26:13 (Perez).)

Thereafter, Perez and the other employee went to a restaurant from which they could see Deer Path. (Tr. Vol. VI-27:4–20 (Perez).) While there, Perez observed Plaintiff leave Deer Path, get into his vehicle, and leave the premises. (Tr. Vol. VI-27:24–28:2 (Perez).) Perez explained that, "knowing that the security wasn't secured, more specifically the encryption devices, we proceeded back to the facility, and we maintained observation of the entrance the entire time." (Tr.

18

Vol. VI-28:7–11 (Perez).)  Perez characterized Plaintiff's departure from the facility as "a pretty big security violation" and explained that violations surrounding communications security could "gravely harm not just your career but the nation." (Tr. Vol. VI-31:16–19 (Perez).)

Perez testified that, given that this was a security violation, "[he] addressed it immediately upon [Plaintiff's] return."  (Tr. Vol. VI-29:20–30:3 (Perez).)  Perez testified that Plaintiff responded that he was "unaware that he could not depart the facility." (Tr. Vol. VI-30:5–8 (Perez).)  Plaintiff testified that he recalled a conversation with Perez in which Perez said that Plaintiff had left the building unlocked. (Tr. Vol. II-98:23–99:2 (Harris).)

Perez stopped the conversation and immediately contacted Ross to report the violation, since Ross (and not Perez) was Plaintiff's supervisor. (Tr. Vol. VI-30:5–25 (Perez).)  Perez left the facility, went to his vehicle where he kept his cell phone, and contacted Ross. (Tr. Vol. VI. 30:25–31:5 (Perez).)  Ross testified that "Captain Perez told [her] that Mr. Harris had a cell phone inside the building, and that he left for hours, leaving alone people who were inside the building that were not secured." (Tr. Vol. IV-49:20–23 (Ross).)  Of course, as noted above, Perez testified that Plaintiff had left the facility unattended, not that he had left persons unattended.  Further, when asked: "When you reported Mr. Harris leaving devices unattended in the DeerPath facility, you did not also report that Mr. Harris was using his cell phone in there as well, did you?" Perez responded: "That was since my encounter." (Tr. Vol. VI-32:12–15 (Perez).)

Ross explained that she was concerned about Plaintiff's behavior because it was "a huge security violation" that could "compromise security." (Tr. Vol. IV-49:21–50:9 (Ross).)  Ross also testified that it was significant that this report had come from outside of her own unit, and that: "being the brigade S6, you put people in place that you trust to do the right thing. And [Plaintiff] didn't -- at the time it was reported that he did not do that.  So it was a little bit embarrassing, I

would say, for me." (Tr. Vol. IV-50:12–15 (Ross).)  She explained that "[a]t that point learning about the security violations on top of the unwillingness to support the team, not showing up when expected and the number of times being late or not showing up at all to work, that was pretty much the apex for me.  I had had enough at that point." (Tr. Vol. IV-51:5–9 (Ross).)  She explained that she requested Plaintiff's termination for a combination reasons, but reiterated that "the apex [ ] was when we got the phone call from someone outside of our shop from the battalion S6 saying that he had committed these security violations." (Tr. Vol. IV-72:6–9 (Ross).)  Ross explained that she then "got together with . . . [her] deputy, and [they] discussed it, and then shortly after that is when [she] recommended that [Plaintiff] be removed." (Tr. Vol. IV-51:11–13 (Ross).)

The SCIF SOP indicates that "[a]ll security incidents involving classified information will involve a security inquiry, a security investigation, or both." (Pl. Ex. 17 (SCIF SOP).)[14]  Plaintiff testified that no one contacted him about an inquiry or investigation about his time at Deer Path. (Tr. Vol. II-99:17–20 (Harris).)   Ross testified that she did not recall if anyone initiated an investigation or inquiry after the incident. (Tr. Vol. IV-67:9–11 (Ross).)  Perez testified that he did not "vividly recall" an investigation or inquiry, but knew "that standard protocol is to submit a sworn statement in addition to his] notification to Major Ross." (Tr. Vol. VI-33:1–6 (Perez).)

### iv.   Cell Phone Usage

Plaintiff testified that he brought his cell phone into Deer Path because he and two other

---

[14]     Cann described the process after a violation takes place.  He explained that the individual who saw the event would report it to a supervisor and to the S2 and—if it involved "some sort of equipment or network"—it would also be reported to the S6. (Tr. Vol. IV-158:9–17 (Cann).)  He explained that "it would be talked about with the leadership, meaning the commander or deputy commander, and then they would . . . talk with the ATC commander who was responsible for -- again, assign someone to do a preliminary investigation." (Tr. Vol. IV-158:20–159:2 (Cann).)  "The situation would be left either with the supervisor" or "[i]t would probably go up to brigade commander." (Tr. Vol. IV-159:5–7 (Cann).)  There are various possible dispositions for a security violation, including termination, loss of security clearance, or rescinding the individual's "authority to do this certain job." (Tr. Vol. IV-159:11–15 (Cann).)  Cann explained that "it all depends on basically the person who conducts the preliminary investigation.  And then up to that commander to decide what they recommend . . . so they could increase [the sanction] or maybe even decrease it depending on the situation." (Tr. Vol. IV-159:11–20 (Cann).)

individuals were authorized to do so by Connor, who Plaintiff characterized as the "site security officer." (Tr. Vol. II-96:7–16 (Harris).)  Plaintiff testified that Connor authorized the cell phone usage because the facility had no land lines, so there was no way to communicate without a cell phone. (Tr. Vol. II-96:10–16 (Harris); *see also* Vol. II-171:25 (Artis testifying that there were no landlines).)  Connor, the deputy special security officer at the 902nd Military Intelligence Group,[15] testified that he was not Plaintiff's supervisor or the "cognizant security officer" for Deer Path. (Tr. Vol. V-31:3–5 (Connor).)  He testified that he did not instruct Plaintiff to maintain his cell phone on his person while in Deer Path, as this would be unauthorized, and that Connor did not have the power to authorize such usage. (Tr. Vol. V-46:13–18, 48:20–25 (Connor).)

Connor testified that employees could use their cell phones in the foyer of the facility or outside, and that employees' general practice was to periodically check their phones throughout the day in one of those locations. (Tr. Vol. V-49:1–9, 50:5–15 (Connor).)  Porter also testified that cell phones were not permitted beyond the foyer. (Tr. Vol. IV-101:24–102:6 (Porter).)  With the exception of Plaintiff and Artis, the witnesses uniformly testified that cell phones were otherwise not allowed in Deer Path. (*Compare* Tr. Vol. III-175:6–18 (Young), Tr. Vol. IV-47:18–22 (Ross), Tr. Vol. IV-101:24–102:6 (Porter), Tr. Vol. IV-117:17–22 (Ponder), Tr. Vol. IV-156:17–23 (Cann), *and* Tr. Vol. V-45:21–23 (Connor), *with* Tr. Vol. II-173:18–174:5 (Artis).)  Further, the witnesses—including Plaintiff—testified that there was signage relating to the use of cell phones in Deer Path. (Tr. Vol. II-141:3–5 (Harris agreeing that the Deer Path facility had "signage . . . relating to cell phones"; Tr. Vol. V-38:3–7 (Connor testifying that Deer Path had signage relating to the prohibition of cell phones); Tr. Vol. IV-117:17–22 (Ponder testifying that there were posters

---

[15]     The 902nd Military Intelligence Group and the 780th Military Intelligence Brigade were "sister organizations" under INSCOM, the Army Intelligence and Security Command. (Tr. Vol. V-31:14–25 (Connor).)

and a sign on the door that explained that no cell phones were allowed).)

Plaintiff testified that he used his cell phone only in the foyer area of the facility. (Tr. Vol. II-140:17–20 (Harris).) Later, however, his deposition testimony was read into the record, in which he stated that he took the cell phone beyond the foyer and into the facility to get a call to one of his teammates. (Tr. Vol. II-159:21–160:13 (Harris).)

A voicemail from Connor to Plaintiff was introduced into evidence. (Def. Ex. 19 (Voicemail from William Connor).) In it, Connor asks Plaintiff to keep an eye out for "the Verizon guy" who would be arriving in fifteen to thirty minutes. (*Id.*) Connor testified that he left the voicemail and provided Plaintiff's number to the Verizon technician because his expectation was that Plaintiff would "check his messages and get them when he had his opportunity." (Tr. Vol. V-51:2–24 (Connor).) Connor explained that the Verizon technician knew to go to the building and try to get Plaintiff's attention, as there were glass entryways. (Tr. Vol. V-48:1–19 (Connor).)

Connor testified that, after Plaintiff was fired, Plaintiff asked him to write a statement supporting Plaintiff's position that his cell phone use was authorized, but Connor refused to do so because "[i]t wasn't true." (Tr. Vol V-49:10–25 (Connor).)

### 2. Termination

As noted above, Ross testified that, after the purported security violations, she recommended that Plaintiff be terminated. (Tr. Vol. IV-51:11–13 (Ross).) She did not have the authority to terminate him, but rather had to request his termination, and such request would then be reviewed by the Brigade commander. (Tr. Vol. IV-51:18–23 (Ross).)

Young prepared a memorandum, dated July 31, 2013, for Ross to use in support of Plaintiff's termination. (Tr. Vol. III-170:1–4 (Young); Def. Ex. 22 (July 31, 2013 Memorandum re: Evaluation Summary for Napoleon Harris).) This memorandum indicates that Plaintiff had

time and attendance issues and reported late for work many times and provides the following dates "that he ha[d] reported late for duty or not reported at all": April 8, 15, 22, and 29; May 14; June 3 and 17; and July 9. (Def. Ex. 22 (July 31, 2013 Memorandum re: Evaluation Summary for Napoleon Harris).) The memorandum also indicates that Plaintiff did "not show the motivation to expand his role with the S6" and that "[h]e needs instruction and guidelines on all tasks accomplished." (*Id.*)

Ross then prepared a memorandum, dated August 2, 2013, regarding Plaintiff's termination. (Def. Ex. 23 (August 2, 2013 Memorandum for Commander re: Memorandum for Record – Mr. Napoleon Harris).) The memorandum, addressed to the Commander of the 780th Military Intelligence Brigade "request[ed] the immediate termination of employment" for Plaintiff. (*Id.*) It noted that Plaintiff was late to work on April 8, 15, 22, and 29; May 14; and June 3 and 17; that he did not show up for work on July 9; that he had "committed severe security violations" including bringing "his cell phone into a secure building and then le[aving] individuals without the proper credentials in the same building"; and that he was "incapable of performing his duties" and his "lack of initiative, inability to manage his time, and complete disregard for policies and procedures show that he [was] not a good fit." (*Id.*)

Buckner testified that she supported Ross's recommendation to terminate Plaintiff. (Tr. Vol. V-77:13–16 (Buckner).) She testified that she found that there was good cause to terminate him and that "[o]verall the feedback across two different units, two different chains of command, three senior civilians, and a military chain of command, the . . . feedback was consistent." (Tr. Vol. V-77:17–78:2 (Buckner).) She also testified that she was not aware that Plaintiff had filed an EEO complaint when she considered the removal memorandum from Ross and that she had no reason to believe that his termination was motivated by the complaint. (Tr. Vol. V-78:3–9

(Buckner).) Pechan testified that he also received Ross's memorandum, which he used to prepare

Plaintiff's termination letter. (ECF No. 163, Ex. 6 at 9.)

> Plaintiff was terminated on August 7, 2013. His termination letter provided that:

> Your termination during your trial period is based on the following: Over the past several months you have had repeated attendance related issues. You arrived to work late on at least seven (7) separate occasions since 8 April 2013. Specifically, you reported late to work on April 8, 15, 22, 29; May 14; and June 3, 17. On 9 July 2013 you were not on approved leave and you failed to show up for work that day. While you were subsequently allowed to take leave on those dates, you did not properly request leave in advance. Your repeated failure to report to work on time raises significant concerns about your ability to report to work on a timely basis and be available for the performance of our mission. On or about 25 July 2013, you committed a security violation by bringing your personal cell phone into a Secure Compartmented Information Facility (SCIF) which is expressly prohibited. Also, on 25 and 26 July 2013 you were tasked with escorting individuals who did not have unescorted privileges within the SCIF and you left them unattended which is completely unacceptable and represents a significant security breach. Finally, despite your transfer to more general information management related duties, you have failed to demonstrate any initiative and have required close supervision to accomplish your assigned duties. As a GG-13, step 10, employee you are expected to take charge with little to no supervision. After more than an adequate opportunity to observe your duty performance I do not believe that you are able to perform at the expected level.

(Pl. Ex. 5 (Termination Letter).) The letter was signed by Ross. (*Id.*) Plaintiff refused to sign the

letter. (*Id.*)

> Plaintiff testified that much of the information in the letter was incorrect. He testified that

the dates enumerated in the letter with respect to his time and attendance were inaccurate.[16] Young

---

[16]     More specifically, Plaintiff explained that he was at work on July 9, 2013, (Tr. Vol. II-66:23–25 (Harris)), and his timecards reflect that he took five hours of leave and worked three hours that day. (Pl. Ex. 12 (Timecards).) He also explained that he did not arrive late and worked regular days on April 8 and 22, 2013, (Tr. Vol. II-68:14–23, 70:14–21 (Harris)), and his timecards reflect that he worked nine hours each of those days. (Pl. Ex. 12 (Timecards).) He testified that he received approval from Ross and Young to arrive late on June 3 and 17, 2013, (Tr. Vol. II-71:16–20, 72:18–22 (Harris)), and his timecards reflect that he used annual leave on June 3 and that he used leave without pay on June 17. (Pl. Ex. 12 (Timecards).) He also explained that he was approved for sick leave on April 15 and May 14, (Tr. Vol. II-69:12–21, 71:4–8 (Harris)), and his timecards reflect the same. (Pl. Ex. 12 (Timecards).) April 29 appears to be a regular workday. (Pl. Ex. 12 (Timecards).)

          Further, as is relevant for the July 9 date, Woods testified that if an AWOL is changed to annual leave, the AWOL could still be used as a basis for discipline. (Tr. Vol. VI-42:5–8 (Woods).)

testified that, since preparing the July 31, 2013 memorandum, he had determined that some of the dates were mistaken, as some dates had been approved by Ross but Young had not been aware of that approval. (Tr. Vol. III-170:19–24 (Young).) Ross agreed that there were "a few dates out of the many" that were inaccurate in the termination letter. (Tr. Vol. IV-68:1–2 (Ross).) Young testified that it is possible that Plaintiff was late on some of these days, and they allowed him to make up the hours by working late. (Tr. Vol. III-171:3–5 (Young).) With respect to the cell phone issue, Plaintiff testified that he was authorized to use his cell phone, and that his termination letter was the first time he had heard that there was an issue with his cell phone usage in Deer Path. (Tr. Vol. II-96:7–97:12 (Harris).) Further, he testified that he never left persons unattended at Deer Path. (Tr. Vol. II-97:19–98:12 (Harris).)

### 3. McGriff's Testimony Regarding Plaintiff's EEO Complaint

McGriff testified about conversations surrounding Plaintiff's EEO complaint. His testimony is at times difficult to follow and his recitation of the timeline of events is unclear. However, he testified in essence that Young and Ross discussed the EEO complaint openly with other employees and, after McGriff was terminated at the end of August 2013, Ross attempted to speak with him about the complaint. For example, when asked during his deposition about the timing of Ross's discussions surrounding Plaintiff's EEO complaint, he responded:

> I don't -- it wasn't like a -- this happened like -- I don't know the month, but it was like one day it came out. Like all of a sudden, it was like, "Hey, Mr. Harris went to the EEOC on the Army, right?" It just came out one day. And then, I guess when she found out, that's when she started asking me about why did he go to the EEOC and things like that. I don't know the exact dates.

(Tr. Vol. III-18:6–15 (McGriff).) In response to the question "do you recall about how long before Mr. Harris was fired Ross started talking to you about his EEO complaint?" McGriff responded:

> Well, Mr. Harris was -- the EEOC complaint, he didn't get fired right then. The EEOC complaint came out. That's when -- you know, she didn't come to me

directly. It was just a conversation held within the building about his EEOC, right? Then when Mr. Harris was fired, that's when she really pressed it, to have a conversation with me. And I wasn't willing to talk about it because he never shared it with me. But she knew we had a relationship, like she knew he only talked to me. So when that happened, it was -- it was, you know, "Can I talk to you in my office? You know, do you know why he did it?" "No." I mean, it was just like she was scared. She was scared, right? So I think she was trying to get some information, and I wasn't willing to do it.

(Tr. Vol. III-19:24–20:14 (McGriff).) He also claimed that, before he was terminated (but after

Plaintiff was terminated):

[T]he whole week they were trying to talk to me about Mr. Harris. So it was like four days they was talking to me and trying to write things down that he did. And do you remember he did this? Do you remember he did that? And I wouldn't cooperate with their story. All of them was trying to get a story together about Mr. Harris when they found out he went to EEOC.

(Tr. Vol. III-51:14–20 (McGriff).)

However, McGriff also testified that he never heard anyone say that Plaintiff should be

terminated or otherwise punished because he filed an EEO complaint. (Tr. Vol. III-40:16–41:8

(McGriff).) His testimony on this score was as follows:

Q      Okay. You did not hear anyone, Mr. McGriff -- Michael Young, Major Ross, anyone else -- say that Mr. Harris should be removed from employment with the Army because he had complained to the EEO office; is that correct?

A      When? Like what time frame?

Q      At any time did you hear anyone . . . -- Michael Young, Major Ross, anyone else -- say that Mr. Harris should be removed from employment because he had complained to the EEO office?

A      No.

(Tr. Vol. III-40:16–25 (McGriff).)

McGriff testified that Ross asked him to provide false information regarding the status of

Deer Path as a SCIF. His testimony was as follows:

Q      Okay. Did Major Ross or Michael Young ask you to provide false information at any point during your career about, you know, Mr. Harris?

26

A       Major Ross did . . . .

Q       Can you explain -- when did she do that, do you recall?

A       She did it after he was terminated.

Q       Okay.  And can you explain what happened?

A       I mean, she -- like I said, she called me when he was terminated.  Right after
I got terminated, she claims she didn't -- she had nothing to do with that.  But she
was, like, "I need you to tell me what happened.  Why did Mr. Harris go to EEOC?
You're the only one who knows.  He's always talking to you."

It was never, you know -- it was a situation that happened that she -- if somebody
is SCIF, right -- so if it was SCIF that she tried to -- it wasn't he knew -- it was in
the SCIF.  It was a building, right, that she tried to claim -- she assumed that it was
a SCIF, which it wasn't a SCIF.  So she was trying to -- to me, she was trying to --
they were trying to counsel him on trying to say he didn't lock a SCIF or something
to that point with a SCIF . . . . So she had called me when I -- she had terminated
me.  She said it was a SCIF.  Can you -- basically, "Can you say it was a SCIF?"
Because I used to accredit a SCIF.  I used to work for [Defense Information Systems
Agency].  I used to work for defense over there in Fort Meade.  I said, "No, it wasn't
a SCIF."  It's not a SCIF.

(Tr. Vol. III-29:8–23 (McGriff).)

Ross testified that she never discussed Plaintiff's EEO complaint with McGriff.  (Tr. Vol.

IV-53:23–54:7 (Ross).)  She also testified that she did not make an announcement to the S6

regarding the EEO complaint.  (Tr. Vol. IV-53:9–19 (Ross).)  Other employees testified similarly.

(Tr. Vol. III-177:14–17 (Young testifying that Ross never made an announcement to the S6 that

Plaintiff had complained of discrimination); Tr. Vol. IV-135:2–8 (Ponder testifying that she never

heard Ross announce that Plaintiff had filed an EEO complaint or that Ross was going to terminate

Plaintiff).)  Porter testified that Ross did not announce to the S6 that Plaintiff had filed an EEO

complaint before Plaintiff was fired, and that he was not sure whether Ross told members of the

S6 that Plaintiff had filed a complaint at some point after Plaintiff was fired or whether "it was

assumed, being that afterwards that we were told that there's been a suit filed."  (Tr. Vol. IV-

107:2–6 (Porter).)  Porter testified that Ross never pressured him to testify any particular way

regarding the complaint. (Tr. Vol. IV-107:15–21 (Porter).)

### 4. Damages

Plaintiff testified that Defendant's actions caused him to be depressed and anxious and that he has "been paranoid thinking the Army is going to send someone at [him]." (Tr. Vol. II-112:15–22 (Harris also explaining that he has "been concerned about [his] vehicle being booby-trapped for a bomb" and that he has been "scared to pull up at [his] house at night due to some trees in the back yard"); Tr. Vol. II-113:24–114:16 (explaining a situation where he forgot he had ordered a package and when the box arrived at his house, he believed it was a bomb).) He testified that he feels like: "It's the United States Army. It's just little ole me." (Tr. Vol. II-113:20 (Harris).)

Plaintiff's friend, Word, testified regarding damages as a lay witness. He described Plaintiff as withdrawn and distant after he was terminated. (Tr. Vol. III-62:9–14 (Word).) He also explained that Plaintiff gained weight and that his "house was a wreck." (Tr. Vol. III-64:1–14 (Word).) Word testified that Plaintiff "worries about everything" and is "paranoid." (Tr. Vol. III-68:11–12 (Word).) He noted that "the latest incident was that stupid box in his driveway." (Tr. Vol. III-68:12–16 (Word).)

### B. McGriff's Availability as a Witness

In addition to the trial itself, of relevance here is McGriff's tortured history prior to trial before this Court. During discovery, Defendant attempted to serve McGriff with a deposition subpoena on January 27 and 28, 2021, and McGriff would not accept service. (ECF No. 40.) Plaintiff then successfully served the subpoena on McGriff on May 3, 2021. (*Id.*) McGriff did not appear for his May 19, 2021 deposition, so counsel rescheduled it. (*Id.*) McGriff also did not appear for his June 2, 2021 deposition. (*Id.*) Thereafter, Plaintiff filed Motions for Contempt (ECF Nos. 41, 46) and, in an Order dated July 6, 2021, the Court ordered McGriff to appear at the

Courthouse to testify at a deposition on August 13, 2021. (ECF No. 48.) On August 16, 2021, Plaintiff renewed his Motion for Contempt due to McGriff's failure to appear for the deposition. (ECF No. 51.) The Court ordered McGriff to show cause why he should not be held in contempt. (ECF No. 52.) He did not do so, and the Court granted Plaintiff's Motion for Contempt. (ECF Nos. 57, 58.) Accordingly, the Court issued a warrant for McGriff's arrest on September 10, 2021, and McGriff was arrested and brought before the Court. (ECF Nos. 59, 60.) The Court admonished him and ordered his release on the condition that he appear in person for a deposition on October 5, 2021. (ECF No. 62.) McGriff appeared for that deposition.

On August 18, 2022, with trial scheduled to begin on August 22, 2022, Plaintiff filed an Emergency Motion to Postpone Trial. (ECF No. 119.) Plaintiff sought the postponement because he had been unable to serve McGriff. (*Id.*) Plaintiff's counsel explained that she had timely notified him of the trial dates in June 2022, (Tr. Vol. I-42:6, ECF No. 166), and that process servers attempted to serve him on August 5, 2022, but no one answered the door. (ECF No. 119.) On August 9, 2022, the process server spoke to an occupant of McGriff's residence, who explained that he was overseas and would not return until November 2022. (*Id.*) On August 16, 2022, the process server spoke to McGriff's daughter, who advised that he was out of town and she did not know when he would be back. (*Id.*) McGriff also "initially informed Plaintiff's counsel that he was out of the country for work and that he would not return to the United States until October 2022" but then told counsel during the week of August 18, 2022 "that he will appear for trial." (*Id.*) However, McGriff then stopped responding to counsel's further attempts to communicate. (*Id.*) Then, on or around August 20, 2022, McGriff told counsel that "he would appear by videoconference[,]" but then again stopped communicating with counsel. (Tr. Vol. I-37:14–21.)

The Court denied Plaintiff's Motion to Postpone. (ECF No. 121.) Thereafter, and after

29

argument from counsel, the Court found that McGriff was unavailable within the meaning of Federal Rule of Evidence 804(a)(5)(A) such that McGriff's deposition transcript could be read into the record at trial. (Tr. Vol. I-42:12–44:9.)  In so concluding, the Court determined that it was a "close call" and that there was "less than 100 percent confidence that plaintiff's counsel did all that they should have done to try to secure the presence of this witness." (*Id.*)

The parties were ordered to review McGriff's deposition transcript and prepare a redacted version to be read to the jury.  As a result of that process, the Court also identified concerns regarding the testimony.  For example, during the Court's review of the deposition transcript, it became clear that McGriff was likely not testifying about the Deer Path facility, but was testifying about a different facility. (*See* Tr. Vol. II-204:2–205:20 (the Court explaining that the Deer Path facility "is a building in an office park in Elkridge" but that the facility McGriff was discussing was "an old building on the base that used to be a barracks that wasn't a SCIF")).)  The Court therefore struck certain parts of the deposition transcript.

## II.    *Legal Standards*

A motion under Rule 50(b) "assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim." *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 155 (4th Cir. 2012).  A court must grant a Rule 50(b) motion for judgment as a matter of law if, "viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Pitrolo v. Cnty. of Buncombe*, 407 F. App'x 657, 659 (4th Cir. 2011) (citations and quotations omitted).  Upon a Rule 50 motion, the court cannot weigh the evidence or consider the credibility of the witnesses. *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir. 1999).

30

The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000). The court should "assume that testimony in favor of the non-moving party is credible, 'unless totally incredible on its face,' and ignore the substantive weight of any evidence supporting the moving party." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1419 (4th Cir. 1991)).

A motion for a new trial made under Federal Rule of Civil Procedure 59(a) is "governed by a different standard" than a Rule 50(b) motion. *Cline*, 144 F.3d at 301. Rule 59(a) permits a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." As the Fourth Circuit has explained:

> Despite the permissive language of this Rule, we have interpreted it to require district courts to set aside the verdict and grant a new trial where (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 268 (4th Cir. 2021) (citations and quotations omitted) (reversing a district court's denial of a new trial motion), *cert. denied*, 143 S. Ct. 442 (2022). In determining whether to grant a new trial, "[g]iven the district court's intimate familiarity with the trial, the district court may weigh evidence and assess credibility[.]" *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994) (citations and quotations omitted). "If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that the judge will grant a new trial." Charles Wright & Arthur Miller, Federal Practice and Procedure § 2806 (3d ed.). A district court has "broad discretion" in ruling on a motion for a new trial. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 (4th Cir. 2001). In addition, "the district court is fully empowered to reverse its evidentiary rulings post-trial and to reconsider that evidence's effect on

the trial." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 194 (4th Cir. 2000).

### III.   *Analysis*

At trial, Plaintiff had the burden to prove, by a preponderance of the evidence, that his EEO complaint was the but-for cause of his termination. Although the Court finds that there was a legally sufficient basis, pursuant to Rule 50, for the jury to find in favor of the Plaintiff, the Court finds that, pursuant to Rule 59, the clear weight of the evidence reflects that the EEO complaint was not the but-for cause of Plaintiff's termination. Accordingly, the Court will deny Defendant's Motion to the extent that it seeks judgment as a matter of law but will grant the Motion to the extent that it seeks a new trial given the weight of the evidence adduced at trial. To the extent that Defendant seeks a new trial nisi remittitur, that issue is mooted by the Court's grant of a new trial.

#### A.   Title VII Retaliation Claim

The only claim at issue at trial was Plaintiff's claim that he was terminated in retaliation for exercising his right to file an EEO complaint in violation of Title VII. There was no direct evidence of retaliation in this case, and the focus at trial was on Plaintiff's "ultimate burden of persuading the [jury] that [he] has been the victim of intentional retaliation."[17] *Foster v. Univ. of*

---

[17]     This is so because once "the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993). "To put it another way, once the court is satisfied that the defendant has met its burden of production, there is no longer any presumption of [retaliation] and the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved that the defendant intentionally [retaliated] against [him]." *Kozlowski v. Hampton Sch. Bd.*, 77 F. App'x 133, 141 (4th Cir. 2003) (quotations and citations omitted).

Under the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must establish a prima facie case by showing: "(i) that [he] engaged in protected activity, (ii) that [his] employer took adverse action against [him], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Foster*, 787 F.3d at 250 (internal quotation marks and citation omitted). "The burden then shifts to the [defendant] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* If the defendant sustains its burden, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

Here, Plaintiff made out a prima facie case of retaliation: the parties stipulated that Plaintiff engaged in protected activity and that he was terminated. Further, Plaintiff was terminated approximately three weeks after he complained of unlawful discrimination. That is sufficient to establish causation for purposes of step one of *McDonnell*

*Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (alternations, quotations, and citations omitted).  To carry this burden and prove that Defendant's proffered non-retaliatory reasons were pretextual, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Id.* (alterations, quotations, and citations omitted).  The plaintiff must prove "that retaliation was a but-for cause of a challenged adverse employment action." *Id.*; *E.E.O.C v. A.C. Widenhouse, Inc.*, 576 F. App'x 227, 229–30 (4th Cir. 2014) ("'[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' and not merely a motivating factor." (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013))).

A plaintiff can prove "pretext either by showing that [the defendant's] explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).  For instance, a showing that defendant "at different times, gives different and arguably inconsistent explanations" may allow an "infer[ence] that the articulated reasons are pretextual." *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)).  Likewise, "a factfinder could infer from the late appearance of [defendant's] justification that it is a post-hoc rationale, not a legitimate explanation for [its] decision." *Id.* (citation omitted).  Further, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's

---

*Douglas. See, e.g., Foster*, 787 F.3d at 253.  In addition, Defendant met its burden of production by introducing several non-retaliatory reasons for terminating Plaintiff. *See Kozlowski*, 77 F. App'x at 140.

Therefore, the focus at trial was on the "ultimate question": whether Plaintiff was terminated in retaliation for filing an EEO complaint. *See Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995) ("[W]e no longer concern ourselves with the vagaries of the *prima facie* case because subsequent to a trial in a Title VII action, the ultimate issue is one of [retaliation] *vel non*.").

asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. In addition, "temporal proximity alone is not sufficient to establish that [a plaintiff's] engagement in protected activity was a 'but for' cause" of his adverse employment action. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

Moreover, while "[w]orkers are shielded from retaliation on account of their assertion of rights protected under Title VII[,]" "a complaining worker is not thereby insulated from the consequences of insubordination or poor performance." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). Further, "Title VII is not a vehicle for substituting the judgment of a court [or jury] for that of the employer." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) (internal quotation marks and citation omitted). The court and the jury do "not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.* at 299. Rather, "[t]he crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez*, 57 F.3d at 383.

### B. Denial of Defendant's Rule 50 Motion[18]

The ultimate question before the Court with respect to Defendant's Motion to the extent it seeks judgment as a matter of law, is whether—viewing the evidence in the light most favorable to the Plaintiff and without considering the substantive weight of the evidence or assessing witness

---

[18]     Defendant moved for judgment pursuant to Rule 50 after the close of Plaintiff's evidence. (Tr. Vol. III-78:2–79:13.) The Court denied the motion, concluding that, while "this is not a strong case[,]" it was "not so weak a case that it would be appropriate for the Court to take it from the jury and decide the case and simply grant judgment." (Tr. Vol. III-79:14–19.) The Court "f[ound] that there continues to be enough, barely, for this to move on to resolution by the jury." (Tr. Vol. III-81:15–19.)

Defendant again moved for judgment was a matter of law after the close of all evidence. (Tr. Vol. VI-49:21–52:11.) The Court concluded that, despite "substantial evidence in this record in support of" Defendant's position, there was "a legally sufficient evidentiary basis to support the [P]laintiff's theory in the case." (Tr. Vol. VIII-3:7–4:3, ECF No. 171.) The Court so concluded based on the standard used in evaluating a Rule 50 motion, which does not permit the Court to weigh evidence. (*Id.*)

credibility—a reasonable jury could conclude that Defendant's reasons for terminating him were pretext for unlawful retaliation. Considering the stringent standard by which the Court must assess a Rule 50 motion, the Court concludes that there was sufficient evidence adduced at trial tending to show pretext that precludes the Court from granting judgment as a matter of law in favor of Defendant. The evidence—construed in the light most favorable to Plaintiff and without considering the countervailing evidence in favor of the Defendant—includes the following.

First, the jury was required to find that the relevant decisionmakers were aware of Plaintiff's EEO complaint prior to his termination. The jury could have credited Plaintiff's testimony that he told Young and Ross about his EEO complaint before he was terminated and could have disbelieved the Defense witnesses (including Young and Ross) who all testified that they were not aware of the complaint prior to Plaintiff's termination and only learned of it later, after Plaintiff had been terminated. The jury could have been further persuaded by the exhibits that indicated that an EEO investigation was underway in August 2013 and could have inferred from the inclusion of notes in an EEO Counselor's Report regarding an interview with Young that Young was aware of the EEO complaint at least as of August 15, 2013. (Def. Ex. 17 (EEO Counselor's Report).) The jury could have also believed that a letter addressed to Young from August 2013 proved that he was aware of the EEO complaint earlier than he indicated. (*See* Pl. Ex. 11 (August 2013 Memorandum to Young re: Responding Management Official – Participation in Complaint Processing).) Further, to the extent that the jury drew these inferences from these documents (i.e., that Young was aware of the EEO complaint earlier than he testified), they could have also inferred that Young was not being truthful in his testimony and was trying to hide the fact that Plaintiff had been terminated in retaliation for filing the EEO complaint.

Second, Plaintiff—despite having time and attendance and performance issues dating to

around March 2013—was not terminated until August 2013. The jury could have inferred that, by terminating Plaintiff only after he had filed an EEO complaint, Defendant was motivated by a retaliatory purpose. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) ("In retaliation cases, courts must determine what made the employer fire the employee *when it did.*" (citations, quotations, and alterations omitted)). In other words, the jury could have concluded that Defendant was willing to tolerate Plaintiff's time and attendance and performance issues until he filed an EEO complaint, but that the EEO complaint was the tipping point and served as the trigger for his termination. This is impermissible under Title VII. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218 (4th Cir. 2016) ("[Plaintiff's] burden is only to show that the protected activity was a but-for cause of her termination, not that it was the sole cause.").

Third, information in Plaintiff's termination letter was apparently incorrect, including the characterization of the security incident and dates relating to Plaintiff's absence. The jury could infer pretext from these inaccurate explanations. *Sears Roebuck*, 243 F.3d at 853 (explaining that "different and arguably inconsistent explanations" creates inference of pretext); *Okoli v. City Of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." (citation and quotations omitted)).

Fourth, with respect to the Deer Path incident, the jury could infer pretext based on a variety of issues. The jury could have found that Defendant set Plaintiff up to fail at Deer Path by not sufficiently preparing him for the tasks to which he was assigned. *See Watson v. Norton*, 10 F. App'x 669, 679 (10th Cir. 2001) ("[C]ircuits have recognized that pretext can be proven by showing that a supervisor set an employee up to fail." (collecting cases)). For instance, the witnesses uniformly testified that they did not provide Plaintiff with a copy of the SCIF policy or

require him to sign or certify that he had reviewed such policy, and the SCIF SOP requires, *inter alia*, that "[e]ach individual assigned to work inside a SCIF must read this SOP and certify in writing annually they understand and will comply with the established security processes, actions, and procedures." (Pl. Ex. 17 (SCIF SOP).) Further, Plaintiff testified that he was not provided with sufficient instruction prior to working at Deer Path.

In addition, with respect to Plaintiff's use of his cell phone, the jury could have credited Artis and Plaintiff's testimony that they were permitted to use cell phones, and could have also considered the voicemail from Connor as evidence of this permission. The jury could have disbelieved Connor's testimony that he did not give Plaintiff permission to use his cell phone in favor of Plaintiff's testimony that he received such permission.

Further, because there were inconsistent explanations regarding what occurred at Deer Path and there does not appear to have been an investigation to clarify exactly what Plaintiff had done, the jury could have inferred that the Deer Path incidents were not the sort of security violations that would ordinarily justify termination. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 728 n.4 (4th Cir. 2019) ("[P]retext may be established by showing that a justification was insufficient to warrant the challenged conduct." (citation and quotations omitted)).

Fifth, the jury could have inferred pretext based on the dates recorded on certain documents entered into evidence. As noted above, some documents regarding Plaintiff's time and attendance issues are dated December 2013 and March 2014, months after Plaintiff was terminated. The jury could have disbelieved Young's explanation that a new date was populated on the documents when he accessed them, and could have believed that the documents were created on these later dates. *See Sears Roebuck*, 243 F.3d at 853 ("[A] factfinder could infer from the late appearance of [the] current justification that it is a post-hoc rationale.").

37

Finally, the jury may have credited McGriff's testimony. As noted, McGriff testified that Young and Ross openly discussed Plaintiff's EEO complaint and that Ross contacted McGriff to obtain information regarding the complaint. If credited, this testimony is evidence of impropriety on the part of Plaintiff's supervisors and, at least circumstantially, could give rise to the inference that his supervisors were negatively motivated by the EEO complaint.

In sum, Plaintiff was required to prove that retaliation was the but-for cause of his termination, and "[d]etermination of motive is ordinarily a function within the province of the fact finder because so much depends on an assessment of the credibility of the witnesses[,]" *Taylor v. Home Ins. Co.*, 777 F.2d 849, 854 (4th Cir. 1985), which the Court may not assess in determining whether to grant a motion for judgment as a matter of law. Thus, in reviewing a motion for judgment as a matter of law, "[a] finding of motive should not be set aside by the reviewing court unless the evidence clearly compels rejection." *Id.* Here—without weighing evidence or assessing credibility, and viewing the evidence in the light most favorable to Plaintiff—the Court cannot conclude that the evidence "compels rejection" of the jury's conclusion, given the various inferences the jury could have drawn based on the evidence described above.

Accordingly, the Court will deny Defendant's Motion to the extent that it seeks judgment as a matter of law pursuant to Rule 50.

### C. Grant of Defendant's Rule 59 Motion

In contrast with the Rule 50 standard, on a Rule 59 motion the Court assesses the weight of the evidence, is not constrained to view the evidence in the light most favorable to the prevailing party, and may assess witness credibility. Indeed, "[a] court can exercise its discretion to grant a new trial if the verdict, even though supported by enough evidence to defeat the motion for judgment notwithstanding the verdict, is against the weight of the evidence." *Taylor*, 777 F.2d at

38

855; *see also E. Tenn. Nat. Gas Co. v. Thomas*, 298 F. App'x 261, 264 (4th Cir. 2008) (affirming a district court's grant of a new trial and explaining "[t]o do so, the court did not need to conclude that the evidence insufficiently supported the verdict, but only that the verdict was against the clear weight of the evidence").

Under the Rule 59 standard, although the Court recognizes the deference owed to a jury verdict, the Court finds that the jury's verdict was against the clear weight of the evidence and, thus, will grant a new trial. In particular, the Court finds that the jury's conclusion that Plaintiff's EEO complaint was the but-for cause of his termination was against the clear weight of the evidence.[19]

### 1. Credibility of Witnesses

The Court will first address the credibility of certain witnesses. As an initial matter, Plaintiff is an interested party, a fact which the Court finds bears on his credibility. In addition, there was evidence in the record at trial that Plaintiff is "paranoid" and suffers from other emotional issues. (*See, e.g.*, Tr. Vol. II-112:15–22 (Harris testifying that he has "been paranoid thinking the Army is going to send someone at [him]"); Tr. Vol. III-68:11–16 (Word describing Plaintiff as "paranoid" and explaining that the "latest incident was that stupid box in his driveway" and that Harris "kept sending [Word] pictures all day about that box").) While these circumstances are regrettable, they also cast doubt on his credibility as a witness. Thus, the Court views Plaintiff's

---

[19]     Plaintiff did not address whether the jury's verdict was against the clear weight of the evidence under the Rule 59 standard. Rather, Plaintiff only argued that Defendant was not entitled to judgment as a matter of law under Rule 50 given the evidence adduced at trial, as there was legally sufficient evidence for the jury to conclude that Defendant retaliated against Plaintiff. As discussed above, the Court agrees with Plaintiff on this point. However, Plaintiff failed to address the evidence under the Rule 59 standard, which is less favorable to Plaintiff. Plaintiff only recites various jury instructions and explains that the jury's finding is not against the clear weight of the evidence, but does not explain why, other than pointing to his Rule 50 analysis, which relates to the legal sufficiency of the evidence. (ECF No. 173 at 25–26 (explaining that "as set forth in [the discussion of Rule 50] above, the jury's verdict is not against the weight of the evidence" and "the verdict is consistent with the jury instructions").)

testimony with some skepticism.

Further, the Court finds that McGriff was not a credible witness, and therefore does not credit his testimony. In addition, because the Court found McGriff to be an unavailable witness, his testimony was read into the record at trial. This circumstance became a textbook example of the importance of live testimony and the imperfect nature of admitting deposition testimony at trial. The jury was deprived of the opportunity to see McGriff's testimony for themselves and to assess his demeanor and manner while he testified. It also deprived counsel of the opportunity to question McGriff in the context of the evidence adduced at trial.[20] However, despite the one-dimensional nature of his testimony as presented at trial, the Court does not find him credible for several reasons.

First, the way McGriff comported himself before the Court gives the Court grave doubts regarding his reliability and commitment to the truth-finding process. He disregarded various Court orders and only sat for a deposition after being arrested for civil contempt. (*See, e.g.*, ECF Nos. 57–60, 62.) In addition, the circumstances surrounding attempts to serve him prior to trial reflect that he may have been evading service. (*See, e.g.*, ECF No. 119 at 2 (explaining that on August 5, 2022, the process server attempted to serve McGriff and, despite there being lights on inside and a car in the driveway, "no one answered the door"; on August 9, the process server "spoke to an occupant of Mr. McGriff's residence who" explained that McGriff was overseas and

---

[20]     The Court questions whether it should have admitted this testimony at all, and whether there was additional testimony that should have been omitted pursuant to, for example, Federal Rule of Evidence 403, which allows a court to exclude relevant evidence if its "probative value is substantially outweighed by a danger of[,]" *inter alia,* "confusing the issues" or "misleading the jury."

         However, in arguing for a new trial, Defendant only argues that the Court should not have found McGriff to be unavailable (and does not now argue that the evidence that was admitted should be excluded for some other reason, such as being confusing or misleading) and the Court will not revisit that ruling now, particularly given that the Court finds that McGriff's testimony is due very little (if any) weight.

would not return until November 2022; and on August 16, the process server "spoke to Mr. McGriff's daughter, who advised that he was out of town and she did not know when he would be back").) Further, he was unpredictable and apparently dishonest in his communications with counsel in the days leading up to trial. For instance, McGriff told Plaintiff's counsel that he would be out of the country until October 2022 but, the week of August 15, 2022, McGriff told counsel he would appear for trial. (*Id.*) Thereafter, McGriff did not respond to further communications from counsel, (*id.*), until on or around August 20, 2022, when he told counsel that he would appear for trial via videoconference, but he again stopped communicating with counsel. (Tr. Vol. I-37:14–21.) These circumstances cause the Court to doubt McGriff's reliability as a witness.[21]

Second, McGriff's testimony was often internally inconsistent. For instance, he testified that Ross asked him about Plaintiff's EEO complaint "right after [McGriff] was fired" and that Ross did not "have a direct conversation with [McGriff] before [McGriff] was fired" but then, in response to the question "[a]re you saying before you were fired, [Ross] did have a conversation with you about Mr. Harris's EEO complaint?" (which clearly contradicted what McGriff had just said), he responded "Yes . . . Before I was fired, yes." (Tr. Vol. III-20:15–21:6 (McGriff).) He also testified on direct examination that no one ever complained about Plaintiff's work. (Tr. Vol. III-13:21–14:4 (McGriff).) However, on cross examination, he testified that he heard Ross discuss Plaintiff's work ethic and performance over 10 times in June and July 2013 and that she would say things like: "he's not proficient at his job,' and 'he don't understand what he's doing,' and things like that." (Tr. Vol. III-38:12–20, 53:7–12 (McGriff).) He also testified that he would email

---

[21]  This circumstance underscores the importance of live testimony and cross-examination, as the jury did not have before it evidence relating to McGriff's history before the Court. *United States v. Edwards*, Crim. No. 1:11-161-1, 2012 WL 1119875, at *4 (M.D.N.C. Apr. 3, 2012) ("Rule 608(b) [ ] permits, in the Court's discretion, cross-examination about the underlying facts leading up to the contempt findings and judicial statements at issue.").

Plaintiff "Code Red" when he heard others discussing, *inter alia*, Plaintiff's performance. (Tr. Vol. III-41:9–20 (McGriff).) Further, despite making serious allegations that Ross pressured him to falsely state that Deer Path was a SCIF, he also testified that he did not believe he had any information that could "ruin her career." (Tr. Vol. III-29:20–23, 40:3–15 (McGriff).)

Third, as discussed, it became clear during the Court's review of McGriff's deposition transcript that he was confused (or dishonest) regarding the relevant SCIF. (*See* Tr. Vol. II-204:1–205:20 (the Court explaining that Deer Path "is a building in an office park in Elkridge" but that the facility McGriff was discussing was "an old building on the base that used to be a barracks" and that the Court could not discern whether McGriff was talking about Deer Path).)

Fourth, McGriff's testimony was at times erratic and nonsensical. For example, he testified that Ross's father left him a voicemail and said: "This is Ross's father. I'm a Master Mason, you're a Master Mason. Give me a call, brother. This is -- we can't ruin her career like this." (Tr. Vol. III-39:6–15 (McGriff).) Not only is this allegation absurd on its face, Ross also testified that her father passed away in 2004 when she was deployed in Iraq. (Tr. Vol. IV-54:8–15 (Ross).)

Fifth, McGriff is biased, given his own dismissal from his position with the Army and the circumstances surrounding his dismissal. McGriff was terminated from his position as a contractor with the Army in August 2013 because Ross requested that he be terminated. (Tr. Vol III-17:16–18:3 (McGriff).) Multiple witnesses credibly testified that McGriff was dishonest during his employment with the Army, which led to his termination. Ross testified that she had requested McGriff's removal because he was not completing his work and he had been dishonest about meetings he was attending. (Tr. Vol. IV-55:12–19, 71:15–20 (Ross).) Three witnesses—Ross, Porter, and Ponder—explained that McGriff represented that he was attending certain meetings but that, in reality, he was not attending those meetings. (*See, e.g.,* Tr. Vol. IV-55:12–15 (Ross

42

explaining that she "made some phone calls to the people that [McGriff] said that he was working with and speaking with, and they told me that they had not spoken with Mr. McGriff"); Tr. Vol. IV-105:15–106:3 (Porter testifying that McGriff represented that he had a standing meeting every Friday afternoon with a counterpart at INSCOM, that Ross called that individual to speak with McGriff, and the individual did not know who McGriff was); Def. Ex. 35 (Ponder's notes reflecting that McGriff represented that he had meetings with "Ricky Hollowell at INSCOM" but that Hollowell said that he had never met McGriff).)

For these reasons, the Court finds that McGriff was not a credible witness.

### 2. Supervisors' Awareness of EEO Complaint Prior to Termination

The clear weight of the evidence suggests that the relevant decisionmakers—particularly Young and Ross—were not aware of Plaintiff's EEO complaint at the time he was terminated. This is a necessary predicate to finding Defendant liable for a violation of Title VII, given the requirement that retaliation be the "but-for" cause of Plaintiff's termination.

Every witness—other than Plaintiff and McGriff—who testified as to this issue testified that they were not aware of Plaintiff's EEO complaint prior to his termination. (Tr. Vol. III-176:17–24 (Young testifying that he was not aware of Plaintiff's EEO complaint when he was terminated in August 2013 and that he learned of the complaint "[i]n October of 2013 when we were called by the investigators"); Tr. Vol. IV-52:16–53:8 (Ross testifying that she was not aware of the complaint when she recommended that Plaintiff be terminated and that she found out about the complaint around October 2013 when it was investigated); Tr. Vol. IV-106:13–20 (Porter); Tr. Vol. V-78:3–10 (Buckner).)  These witnesses testified as to the issue uniformly and the Court finds that their testimony was credible.

The only evidence that may tend to show that relevant decisionmakers were aware of

Plaintiff's EEO complaint at the time he was fired is: (1) Plaintiff's own testimony that he notified Young on July 15, 2013 and that he notified Ross on or around July 22, 2013; (2) McGriff's testimony that there were discussions regarding Plaintiff's EEO complaint (although his testimony is less than clear regarding the timing of such discussions); and (3) two documents relating to the EEO investigation that indicate that Young may have been aware of the complaint in August 2013.

The Court does not find Plaintiff's testimony that he notified Young and Ross of his EEO complaint prior to his termination credible against the weight of the testimony by every other witness on this issue. For example, although Plaintiff testified that he told Young about the EEO complaint during the July 15, 2013 meeting with Platt, both Platt and Young testified that they did not know Plaintiff had filed an EEO complaint at that time. (Tr. Vol. II-83:19–25 (Harris); Tr. Vol. III-183:3–7 (Young); Tr. Vol. III-109:12–21 (Platt).)

Further, the documentary evidence does not reflect that Young was aware of the EEO complaint prior to Plaintiff's termination. First, the EEO counselor's report that was admitted into evidence[22] provides a witness statement from several witnesses, including Young. (Def. Ex. 17 (EEO Counselor's Report).) Young's witness statement relates to the July 9 incident when Plaintiff was late to work. (*Id.*) The report includes a "date submitted to EEO officer" of August 15, 2013. (*Id.*) Nowhere does the document indicate that Young was made aware of the EEO complaint, and it is not clear how his witness statement was obtained or whether he was notified of the purpose of his statement. (*Id.*) Further, it is not clear what the August 15 date represents or

---

[22] As noted above, no witness testified regarding this document and thus the Court (and the jury) has no detail regarding how it was created or what these witness interviews entailed. The first time the jury saw this document was during Plaintiff's closing arguments, when Plaintiff's counsel read from the document. (Tr. Vol. VI-65:3–17 (Plaintiff's Closing).)

Further, it may not have been entered into evidence but for an error by the Defendant in not timely objecting to it, and the Court, in deciding to admit it due to the lack of timely objection, explained to counsel that the document would likely be confusing to the jury. (Tr. Vol. V-7:1–17:20.)

whether the witness interviews were conducted prior to that date. In any event, this document is dated after August 7, 2013 (the date of Plaintiff's termination) and it thus does not show that Young was aware of the EEO complaint before Plaintiff was terminated. Second, a letter dated August 2013 and addressed to Young, which lays out the EEO process, was entered into evidence. (Pl. Ex. 11 (August 2013 Memorandum to Young re: Responding Management Official – Participation in Complaint Processing).) However, there is no indication that Young received this letter, much less that he received it prior to Plaintiff's termination. The signature blocks are blank and undated, in contrast to other versions of this letter sent to Platt and Ross, which include Platt and Ross's signatures and are dated. (*Compare id. with* Def. Ex. 56 (September 9, 2013 Memorandum to Ross re: Responding Management Official – Participation in Complaint Processing) *and* Def. Ex. 57 (Memorandum to Platt re: Responding Management Official – Participation in Complaint Processing).)

Finally, while Plaintiff argues that McGriff's testimony established that Young and Ross openly discussed Plaintiff's EEO complaint before Plaintiff's termination, (ECF No. 173 at 5), the Court accords his testimony very little weight. Even if the Court were to consider it, McGriff's testimony regarding the timing of any discussions regarding the EEO complaint is less than clear, is sometimes contradictory, and does not reflect that Young and Ross knew about the EEO complaint before Plaintiff was terminated. Plaintiff argues that McGriff "testified that Major Ross and Mr. Young openly discussed Mr. Harris' EEO complaint with the staff before Major Ross terminated Mr. Harris' employment." (ECF No. 173 at 5.) However, the testimony to which Plaintiff points is the following, which does not clearly set out a timeline regarding when Plaintiff's supervisors were discussing the EEO complaint:

> Q      Okay. About -- do you recall about how long before Mr. Harris was fired Major Ross started talking to you about his EEO complaint?

A      Well, Mr. Harris was -- the EEOC complaint, he didn't get fired right then. The EEOC complaint came out. That's when -- you know, she didn't come to me directly. It was just a conversation held within the building about his EEOC, right? Then when Mr. Harris was fired, that's when she really pressed it, to have a conversation with me.

(Tr. Vol. III-19:24–20:14 (McGriff).)   Moreover, even McGriff testified that he never heard anyone state that Plaintiff should be terminated or otherwise disciplined for filing an EEO complaint.   (Tr. Vol. III-40:16–41:8 (McGriff).)   Finally, McGriff's testimony on this score borders on absurd.   McGriff would have the jury believe that Ross was discussing an EEO complaint with McGriff, an employee that she caused to be terminated. It simply does not add up.

### 3. Bases for Plaintiff's Termination

Further, even if the Court were to find that the evidence tended to show that some or all of the decisionmakers were aware of the EEO complaint before Plaintiff was terminated, this awareness alone is not enough to establish retaliatory intent. As discussed below, the clear weight of the evidence reflects that the EEO complaint was not a but-for cause of Plaintiff's termination.[23]

The crux of Plaintiff's argument is that Plaintiff's "former supervisors failed to provide any valid explanation for suddenly deciding to discipline [him] for behaviors they had excused for months" and that each of the reasons provided in the termination letter (Plaintiff's time and attendance issues, performance issues, and security violations) were false and were a pretext for unlawful retaliation. (ECF No. 173 at 6, 7.) Plaintiff cites *Reeves* for the proposition that "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." (ECF No. 173 at 12 (quoting *Reeves*, 530 U.S. at 148).)

---

[23]      Plaintiff himself testified that, when he told Ross that he had filed an EEO complaint, "she told [him] she couldn't stop [him] from doing it if [he] felt like [Young] was discriminating against [him]; she couldn't stop [him] from going through that process." (Tr. Vol. II-84:22–85:2 (Harris).)

Here, the evidence overwhelmingly shows that Plaintiff was not a proactive employee and that he had serious time and attendance issues, that at least some of those issues were documented, and that those issues could have provided a basis for Plaintiff's termination. While these issues are relevant to the extent that they provide context for Plaintiff's termination, the evidence also shows that Defendant did not terminate Plaintiff until August 7, 2013, after he filed an EEO complaint on July 15, 2013, and after he had worked at Deer Path on July 25 and 26, 2013. Therefore, the pertinent question here is: was Plaintiff's EEO complaint the but-for cause of his termination? The clear weight of the evidence reflects that it was not.

### a.  Time and Attendance and Performance Issues

Plaintiff argues that the time and attendance infractions and the performance issues in the termination letter are unsupported by the evidence and are pretextual. Plaintiff is correct that certain the dates listed in the termination letter are inaccurate (a fact with which Young and Ross agreed at trial). However, the overwhelming, clear weight of the evidence indicates that—even if those particular dates were not entirely accurate and even if Defendant was sloppy and inexact in termination of Plaintiff—Plaintiff had performance and time and attendance issues during his time with the Army.

With respect to Plaintiff's time and attendance issues, the clear weight of the evidence reflects that he had time and attendance issues, and that such issues began in March 2013. The only witness who seemed to believe that he did not have time and attendance issues was Plaintiff himself (and perhaps McGriff), who testified that he received approval from Young and Ross to arrive late and work late when he was coming back from his trips to Georgia. (Tr. Vol. II-60:24–61:1 (Harris).)  Nearly every other witness—Young, Ross, Porter, Ponder, Platt, Chapman, Buckner, Robertson, and Woods—testified that Plaintiff had time and attendance issues. Even

McGriff testified that others perceived that Plaintiff had a time and attendance issue as early as April 2013. (*See, e.g.*, Tr. Vol. III-53:7–12 (McGriff testifying that Ross complained about Plaintiff's whereabouts in April 2013).) These issues came to a head on June 17, when Young required Plaintiff to use leave without pay, (Tr. Vol. II-156:19–157:5 (Young); Tr. Vol. II-72:18–73:10 (Harris)), and July 9 and 15, when Plaintiff was late, Young attempted to require Plaintiff to mark himself as absent without leave, and the situation necessitated a meeting with Platt. (*See, e.g.*, Tr. Vol. II-77:18–25 (Harris).)[24]   The evidence does not reflect any additional time and attendance issues after July 15, 2013 until Plaintiff's termination.

Plaintiff also argues that his performance was not poor. However, the clear weight of the evidence indicates that he was not performing at the level expected by his superiors. Although there was testimony that he performed some tasks adequately—by Plaintiff, McGriff, Artis and Porter—the clear weight of the evidence shows that his supervisors—the relevant decisionmakers—perceived his performance as deficient. His supervisors' assessment is the critical question. Further, Plaintiff's own testimony "cannot establish a genuine issue as to whether [he] was meeting [Defendant's] expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *see Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citation and quotations omitted)). In addition, while the Court does not doubt that Artis's testimony was truthful, Artis was not a relevant decisionmaker and was a contractor who

---

[24]   Plaintiff overstates much of the evidence adduced at trial in his brief. For example, Plaintiff states that "Mr. Young and Major Ross admitted that they took *no action whatsoever to discipline* Mr. Harris for his alleged unauthorized late arrivals until after he filed an EEO complaint, which is consistent with Mr. Harris' testimony that they explicitly excused his tardiness." (ECF No. 173 at 7 (citing Tr. Vol. III-180:25–181:11, Tr. Vol. IV-61:17–62:7) (emphasis added).) This is a misstatement of the evidence. The portions of the transcript to which Plaintiff points do not reflect Young or Ross stating that they never took any action to discipline Plaintiff, but rather reflect Young and Ross agreeing that they did not begin the process of terminating Plaintiff prior to July and August 2013. Indeed, as noted, the evidence shows that Young did take some action on June 17 and July 9 and 15, 2013.

worked with Plaintiff for only a few days. Further, while the Court credits Porter's testimony that Plaintiff at one point resolved a long-standing network connectivity problem, this is hardly sufficient to outweigh an overall assessment from Plaintiff's superiors that Plaintiff was not performing as expected.

On the other side of the equation, Defendant's witnesses uniformly testified to Plaintiff's poor fit for his role. For instance, although it was not provided to Plaintiff, Young drafted a memorandum dated April 12, 2013—far before Plaintiff filed his July 15, 2013 EEO complaint— in which he noted that Plaintiff had not satisfactorily accomplished tasks assigned to him, that he was complacent, and that he was not performing as expected by his grade. (Def. Ex. 8 (Apr. 12, 2013 Evaluation of Napoleon Harris).) Young went so far as to state that he "would not recommend that [Plaintiff] continue in his role with the S6 staff section." (*Id.*; *see also* Tr. Vol. IV-41:8–16 (Ross testifying that Young told her around this time that he believed Plaintiff should not continue in his role).) This evaluation from Plaintiff's direct supervisor is compelling evidence that he was not performing adequately. Other witnesses also testified regarding Plaintiff's poor fit for his role. (Tr. Vol. IV-43:1–13 (Ross); Tr. Vol. III-127:15–22 (Chapman); Tr. Vol. V-74:6–7, 23–24 (Buckner).)[25] Even McGriff testified that he regularly heard Ross discussing Plaintiff's work ethic and performance as early as April 2013.

Thus, the clear weight of the evidence is that Plaintiff was not a good fit for his role in the S6 and that he had time and attendance issues. Therefore, these bases provided in the termination

---

[25]    Plaintiff argues that "Mr. Young admitted that, despite any performance deficiencies . . . he did not take any action until Mr. Harris filed an EEO complaint on July 15, 2013" and that, likewise, Major Ross did not take "any corrective action until after [Plaintiff] filed an EEO complaint." (ECF No. 173 at 12–13.) This vastly overstates Young and Ross's testimony. Neither of these witnesses admitted that they only took corrective action after Plaintiff filed his EEO complaint. Rather, they both agreed that they did not take action to terminate Plaintiff until July 2013 (which was after both the EEO complaint and the Deer Path incident).

letter were not false, even if there were some mistaken dates reflected in the letter.[26]  As Pechan testified, "[a]ny one singular issue identified [in the termination letter] would be grounds for removal during a trial period." (ECF No. 163-9, Ex. 6 at 10 (Pechan also testifying that, even if some of the dates were mistaken in the letter, the letter provided sufficient reason to warrant removal).)

Ultimately, however, the evidence reflects that these issues were not what prompted Ross to recommend Plaintiff's termination, even if they did provide additional justification for that decision.  These issues had been ongoing for months at the time of Plaintiff's termination and there is no evidence, for example, that Plaintiff had another time and attendance issue after the July 15 meeting with Platt.  As discussed in more detail below, Ross explained at trial that it was the Deer Path incident that prompted her to seek Plaintiff's termination.

### b. Deer Path Incident

Plaintiff focuses on the purported falsity of the explanation of the Deer Path incident in the termination letter as pretext for unlawful retaliation.  However, while there were differing accounts of the particulars surrounding the security violation at the Deer Path facility, the clear weight of the evidence establishes that there was some type of security violation, and that this security violation is what spurred Ross to seek Plaintiff's termination.

As an initial matter, the clear weight of the evidence suggests that the Deer Path facility was a SCIF in July 2013.  Every single Army employee that testified as to this fact confirmed that

---

[26]      Further, it is not clear whether several of the dates provided in the letter were truly incorrect.  As the letter indicated, Plaintiff "reported late to work on April 8, 15, 22, 29; May 14; and June 3, 17.  On 9 July 2013 [he was] not on approved leave and [he] failed to show up for work that day." (Pl. Ex. 5 (Termination Letter).)  Many of these days are Mondays and, as Young explained, it is possible that the dates in the letter reflected times that Plaintiff did not request leave, but that Young attempted to accommodate him by allowing him to work late.  Further, while the letter incorrectly states that Plaintiff failed to show up for work on July 9, 2013, it is uncontroverted that Plaintiff was late that day.  This aligns with the statement in the letter that "[w]hile [Plaintiff] was subsequently allowed to take leave on those dates, [he] did not properly request leave in advance." (Pl. Ex. 5 (Termination Letter).)

Deer Path was a SCIF. (Tr. Vol. III-172:18–21 (Young); Tr. Vol. IV-47:3–9 (Ross); Tr. Vol. IV-101:7–9 (Porter); Tr. Vol. IV-117:15–16 (Ponder); Tr. Vol. IV-145:20–22 (Cann); Tr. Vol. V-40:11–12 (Connor).) Further, Defendant introduced an exhibit at trial that indicated that Deer Path was "reaccredited as a" SCIF as of February 2013, months before Plaintiff's purported violation. (Def. Ex. 36 (Facility Reaccreditation).) The only witnesses that testified that Deer Path was not a SCIF in July 2013 were Plaintiff, McGriff, and Artis. As the Court previously noted, it accords McGriff's testimony little weight.[27] In addition, Artis was a contractor and not a full-time Army employee, and the Court accords the Army employees' testimony more weight as it relates to the status of Deer Path as a SCIF. Moreover, Artis agreed during cross-examination that Defendant's Exhibit 36 reflects that Deer Path had been reaccredited as a SCIF as of February 2013. (Tr. Vol. II-184:1–3 (Artis).)

Further, the Court does not find credible Plaintiff's testimony that he did not believe Deer Path was a secured facility. Plaintiff treated the facility as a secured facility, even if Plaintiff was unaware of its technical status as a SCIF. (*See, e.g.,* Tr. Vol. II-96:7–16 (Harris explaining that he received authorization to use his cell phone at Deer Path from the site security officer); Tr. Vol. II-141:3–5 (Harris agreeing that there was a sign relating to cell phone usage in Deer Path); Tr. Vol. II-179:7–17 (Artis testifying that, during the time they worked at Deer Path, there was an instance when Plaintiff would not let "a telephone company guy" in and that Plaintiff called a special security officer to report the occurrence).)[28] Young testified that he believed that the fact

[27] Further, as discussed above, it became apparent to the Court that McGriff was likely mistaken regarding which facility was at issue in this case.

[28] Plaintiff argues that "Defendant's witnesses admitted that they violated the SCIF policy in connection with assigning Mr. Harris to work in the Deer Path facility in July 2013 by failing to provide him with a copy of the SCIF policy." (ECF No. 163 at 9.) This is another exaggeration of the evidence. No witness testified that they violated the SCIF policy, although several witnesses testified that they had not personally provided Plaintiff with a copy of the

51

that Deer Path was a SCIF was brought up in meetings at which Plaintiff was present, (Tr. Vol. III-174:22–25 (Young)), and the other members of the S6—Plaintiff's peers—understood Deer Path to be a SCIF. (Tr. Vol. IV-101:7–9 (Porter); Tr. Vol. IV-117:15–16 (Ponder).)

Next, the clear weight of the evidence is that Plaintiff committed some type of security violation at Deer Path, a fact that even Plaintiff did not dispute at trial. Plaintiff testified at trial that he "recall[ed] having a conversation with Jonathan Perez" and that Perez "mentioned to [Plaintiff] . . . that maybe the building was left unlocked or something like that." (Tr. Vol. II-98:23–99:2 (Harris).) Plaintiff then agreed that Perez told him that he had left the building unlocked, and did not dispute that he had left the building unlocked. (*Id.*) Perez—who witnessed the violation and who reported it to Ross—testified that he observed Plaintiff abandoning his post and leaving the facility when Perez had explicitly instructed him not to leave the facility. (Tr. Vol. VI-25:5–29:12 (Perez).) Ross, on the other hand, testified that "Captain Perez told [her] that Mr. Harris had a cell phone inside the building, and that he left for hours, leaving alone people who were inside the building that were not secured." (Tr. Vol. IV-49:21–23 (Ross).) The version of events from Ross's testimony at trial was reported in her August 2, 2013 memorandum requesting Plaintiff's termination and in Plaintiff's termination letter. (Def. Ex. 23 (August 2, 2013 Memorandum for Commander re: Memorandum for Record – Mr. Napoleon Harris); Pl. Ex. 5 (Termination Letter).)

With respect to cell phone usage, the clear weight of the evidence established that cell phones were not permitted in Deer Path beyond the foyer, and that Plaintiff used his cell phone in an unauthorized manner. The evidence reflects that cell phones were not permitted within the

---

SCIF policy. However, Plaintiff has not pointed to any evidence showing that any of these persons were responsible for providing him with the SCIF policy.

facility and employees' practice was to leave cell phones in the foyer or in personal vehicles and to check them periodically. And, although the evidence at trial was less than clear regarding how Defendant identified Plaintiff's improper cell phone usage,[29] the clear weight of the evidence indicates that Plaintiff did use his cell phone in an unauthorized manner.

Plaintiff testified that he used his cell phone only in the foyer area, (Tr. Vol. II-140:17–20 (Harris)), but his own deposition testimony, which was read into the record, reflected that he took the cell phone beyond the foyer to get a call to one of his teammates. (Tr. Vol. II-159:21–160:13 (Harris).) Further, although Plaintiff testified that he received permission from Connor to use his cell phone beyond the foyer, the weight of the evidence reflects otherwise. Connor testified that he did not instruct Plaintiff to maintain his cell phone on his person while in Deer Path, as this would be unauthorized, and that Connor did not have authority to grant such permission, as he was not Plaintiff's supervisor and was not "the cognizant security officer for the facility anymore." (Tr. Vol. V-46:13–18, 48:20–25 (Connor).)

Although Plaintiff's counsel referred to Connor's testimony regarding his voicemail to Plaintiff as "[p]erhaps the most explosive testimony in this case[,]" (Tr. Vol. VI-76:17–18 (Plaintiff's Closing)), the Court does not find that it changes the clear weight of the evidence analysis. In the voicemail, Connor asks Plaintiff to keep watch for a technician who was due to arrive at Deer Path. As was customary, Connor expected Plaintiff to periodically check his phone. Connor's voicemail does not, as Plaintiff argues, reflect that Plaintiff had permission to use his

---

[29]     In response to the question: "When you reported Mr. Harris leaving devices unattended in the DeerPath facility, you did not also report that Mr. Harris was using his cell phone in there as well, did you?" Perez responded: "That was since my encounter." (*See, e.g.*, Tr. Vol. VI-32:12–15 (Perez).) It is not entirely clear whether this means that Perez later reported that Plaintiff had been using his cell phone, or that it was later discovered that Plaintiff had been using his cell phone.

cell phone beyond the foyer area.[30]  Further, the Court credits Connor's testimony that, after Plaintiff was terminated, Plaintiff asked Connor to write a statement supporting Plaintiff's position that his cell phone use was authorized, but Connor refused to do so because "[i]t wasn't true." (Tr. Vol. V-49:10–25 (Connor).)

Plaintiff argues that these differing accounts of the purported security violation—Perez testified that Plaintiff left equipment unattended and Ross testified that Plaintiff left persons unattended and used a cell phone in an unauthorized manner—merit an inference of pretext. (ECF No. 173 at 11–12.) However, there is a significant difference between wholly fabricating a security violation and misstating the exact contours of a security violation.  Despite having differing accounts of the incident, both Ross and Perez characterized the security violation as a significant one.  Further, given the consistencies between the versions of events—the incident happened at Deer Path, it involved Plaintiff leaving the facility, Perez witnessed it and reported it to Ross— any inconstancies do not warrant an inference that the security violation was fabricated, particularly in light of Plaintiff's own testimony that Perez told him that he had left the "building . . . unlocked or something like that." (Tr. Vol. II-98:23–99:2 (Harris).)

Further, the Court finds Ross's testimony credible regarding the chain of events that occurred after she received the call from Perez.  Ross was motivated and embarrassed by a report outside of her unit regarding an individual in her chain of command.  Ross testified that it was significant that this report had come from outside of her own unit, and that: "being the brigade S6, you put people in place that you trust to do the right thing" and that "it was a little bit embarrassing"

---

[30]     Plaintiff argues that "Defendant's Site Security Officer, William Connor, *authorized* Mr. Harris to bring his cell phone inside the Deer Path facility" with no citation to the record. (ECF No. 163 at 9 (emphasis in original).) This is another instance of Plaintiff's misstatement of the record, and Plaintiff makes this assertion as though it is uncontradicted.

for her. (Tr. Vol. IV-50:12–15 (Ross).) Ross testified that the security violation was the "apex" with respect to Plaintiff. (Tr. Vol. IV-51:5–9 (Ross testifying that "[a]t that point learning about the security violations on top of the unwillingness to support the team, not showing up when expected and the number of times being late or not showing up at all to work, that was pretty much the apex for me. I had had enough at that point."); Tr. Vol. IV-72:6–9 (Ross explaining she requested Plaintiff's termination for a combination reasons, but that "the apex again was when we got the phone call from someone outside of our shop from the battalion S6 saying that he had committed these security violations").)

The timing of the initiation of Plaintiff's termination also reflects that it was the security violation, not the EEO complaint, that motivated Ross. Ross explained that, after the security violation was reported to her, she "got together with . . . [her] deputy, and [they] discussed it, and then shortly after that is when [she] recommended that [Plaintiff] be removed." (Tr. Vol. IV-51:11–13 (Ross).) The documentary evidence in the record supports this testimony, and there is no evidence—documentary or testimonial—that Young and Ross began the process of terminating Plaintiff after July 15 or July 22 (the dates Plaintiff testified he told Young and Ross, respectively, that he had filed an EEO complaint). Rather, the evidence reflects that Plaintiff's termination process only began to take shape after July 25 (the date the termination letter alleges the security violation took place): Young's memorandum for Ross was dated July 31, 2013, (Def. Ex. 22 (July 31, 2013 Memorandum re: Evaluation Summary for Napoleon Harris)), and Ross's memorandum for the commander seeking Plaintiff's termination was dated August 2, 2013. (Def. Ex. 23 (August 2, 2013 Memorandum for Commander re: Memorandum for Record – Mr. Napoleon Harris).)

Thus, the clear weight of the evidence reflects that the real reason for Plaintiff's termination was the security violation at Deer Path, perhaps bolstered by an increasing sense from his

supervisors that he was a poor fit for his role, given his time and attendance and performance issues. This intervening event at Deer Path was a permissible reason to discharge Plaintiff, and of course, Defendant retained the authority to terminate him despite his EEO complaint. *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981) ("[Title VII] . . . was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work. An employer must retain the power to discipline and discharge disobedient employees." (citations omitted)).

As noted above, Plaintiff explains that "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." (ECF No. 173 at 12 (quoting *Reeves*, 530 U.S. at 148).) While this is true, this case reflects that there is a difference between a termination letter that is sloppy and inexact and a termination letter that is false. Plaintiff "must be able to prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Foster*, 787 F.3d at 249 (citing *Nassar*, 570 U.S. at 360). Here, the clear weight of the evidence is that Plaintiff would have been terminated regardless of his EEO complaint.

### 4. Additional Considerations

#### a. Distinguishing Retaliation from Other (Improper) Motivations

The evidence also establishes that Plaintiff likely had poor supervision, that Defendant was careless and perhaps too hasty in its termination of Plaintiff, and that his termination may have been unfair given these circumstances, facts that likely influenced the jury. For instance, Plaintiff received a very poor 90-day evaluation—in which Young "would not recommend that [Plaintiff] continue in his role with the S6 staff section" (Def. Ex. 8 (Apr. 12, 2013 Evaluation of Napoleon Harris))—but that evaluation was never provided to him such that he could be on notice of the

need to improve his performance.  In addition, Young and others may have done Plaintiff a disservice by not being clearer about time and attendance expectations (i.e., by allowing Plaintiff to make up time when he arrived late rather than indicating that such conduct was unacceptable and disallowing it).  These circumstances could have allowed the jury—quite reasonably—to view Plaintiff's termination as unfair.

However, "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not [the factfinder's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'"  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette*, 133 F.3d at 299).  The jury likely did not miss the Defendant's jumbled description of the facts underlying the apparent security violation—the Court certainly didn't. · This confusion might be the best example of the poor supervision and leadership that was endemic while the Plaintiff was detailed to the Brigade S6.  But regardless of such sloppiness, the clear weight of the evidence establishes that Plaintiff was terminated by the Army because Brigade leadership increasingly perceived that he was incompetent, and especially because he was accused of a security violation by another command, and that reflected poorly on Ross.  After Deer Path, Ross was compelled to demonstrate her "*bona fides*" on the sensitive issue of SCIF security; indeed, her reputation outside of S6 was now on the line.

The evidence presented in this trial powerfully shows that Brigade leaders tolerated a marginally performing employee until his actions at Deer Path (which may or may not have amounted to actual misconduct) sparked a conclusion in their minds that now, finally, he had to go.  Was this fair?  Perhaps not.  But does the weight of the evidence firmly support this explanation for his termination?  It does.  With little doubt.  Was his termination in retaliation for filing an

EEO complaint? The clear weight of this evidence says no.

### b. Alleged Juror Misconduct

Further, the Court pauses briefly to address Defendant's argument that a new trial is warranted due to the irregularity that occurred at the end of the jury's deliberations. In brief, Juror 6 left the jury deliberation room prior to the jury's delivery of the verdict to the Court. As a result, the Court conducted a hearing to ascertain the sequence of events in which it questioned each juror and Court security personnel. The Court concluded that there was no evidence of any extraneous contacts or influence, that no deliberations occurred in Juror 6's absence, that the jury had reached a verdict before Juror 6 left the deliberation room, and that no additional substantive discussions occurred once Juror 6 returned. (Tr. Vol. VIII-21:22–43:2.) The Court concluded that there was no basis for a mistrial. (*Id.*) The Court sees no reason to revisit that determination now. However, the juror's unauthorized and unsupervised departure from the jury room does cause the Court to question whether the jurors carefully followed the Court's *other* instructions particularly where, as here, the jury was required to consider the subtle question of whether a seemingly unfair termination was retaliatory. Therefore, although this issue does not provide an independent basis upon which the Court would grant a new trial, it bolsters the Court's conclusion that the jury was likely swayed by a perceived unfairness in the way Plaintiff was treated *wholly apart* from the EEO issue.

### IV.   *Conclusion*[31]

In sum, having observed the trial and the witnesses, the Court concludes that the jury's

---

[31]     Having found that a new trial is warranted based on the clear weight of the evidence, the Court will not address Defendant's arguments that a new trial is warranted due to the Court's admission of McGriff's testimony due to his unavailability or certain comments by Plaintiff's counsel during closing. The Court will also not address whether the award of compensatory damages was excessive and whether the Court should require a new trial nisi remitter, as those issues are mooted by the grant of a new trial.

finding that Plaintiff's EEO complaint was the but-for cause of his termination was against the clear weight of the evidence. There was compelling evidence that Plaintiff was terminated after various issues were identified by his superiors, which culminated in a security violation at Deer Path. Applying the standard for granting a new trial to Plaintiff's retaliation claim, and considering the evidence presented at trial, the Court is firmly convinced that the jury's verdict in Plaintiff's favor was against the clear weight of evidence, and the Court is left with a definite conviction that a mistake has been committed.

Accordingly, the Court will grant Defendant's Motion to the extent that it seeks a new trial. The Court will deny Defendant's Motion in all other respects. The Court will set in further scheduling in this case.

DATED this __/8__ day of April, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

59